# HUUS *v.* NEW YORK AND PORTO RICO STEAMSHIP COMPANY.

**CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.**

No. 514.   Argued January 11, 14, 1901.—Decided May 27, 1901.

Vessels engaged in trade between Porto Rican ports and ports of the United States are engaged in the coasting trade in the sense in which those words are used in the New York pilotage statutes; and steam vessels engaged in such trade are coastwise steam vessels under Revised Statutes, section 4444.

THIS was a libel filed in the District Court for the Southern District of New York to recover spoken pilotage upon the American built steamship Ponce, belonging to the defendant, a New York corporation.

The facts were that libellant, on June 25, 1900, offered his service as a Sandy Hook pilot to the master of the Ponce, then about entering the harbor of New York, her port of distination, from the port of San Juan, in the Island of Porto Rico.   Libellant, who was a duly licensed Sandy Hook pilot, was the first and only one to offer his services.   These services were declined by the master of the vessel, who was himself a licensed pilot for the harbor of New York under the laws of the United States. The steamship was at the time duly enrolled and licensed for the coasting trade under the laws of the United States, and was engaged in trade between Porto Rico and New York.   The libel was dismissed by the District Court, 105 Fed. Rep. 74, an appeal taken to the Circuit Court of Appeals, which certified to this court the following questions of law, concerning which it desired instructions :

" 1. Since the proclamation of the treaty of peace between the United States and the Kingdom of Spain, and the passage of the act of Congress entitled ' An act temporarily to provide

revenues and civil government for Porto Rico, and for other purposes,' (approved April 12, 1900,) do Porto Rican ports remain foreign ports in the sense in which those words are used in the statutes of the State of New York regulating pilotage?

"2. Are vessels engaged in trade between Porto Rican ports and ports of the United States engaged in the coasting trade in the sense in which those words are used in the statutes of the State of New York regulating pilotage?

"3. Are steam vessels engaged in trade between Porto Rican ports and ports of the United States coastwise steam vessels in the sense in which those words are used in section 4444 of the Revised Statutes of the United States?"

*Mr. William Lindsay* for appellant.

*W. F. Kingsbury Curtis* for appellee.    *Mr. William Edmond Curtis* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Conceding it to be within the power of Congress to assume control of and regulate the whole system of pilotage, as applied to vessels engaged in foreign or interstate commerce, it has for obvious reasons left to the several States the power to legislate upon this subject, and to prescribe rules for the licensing and government of pilots, the collection of their fees, and such other incidental matters as the nature of their services in the particular localities may require. The power to do this was recognized by this court in *Cooley* v. *Board of Wardens*, 12 How. 299, though it was subsequently said to be subject to such restrictions as Congress might see fit to impose. *Spraigue* v. *Thompson*, 118 U. S 90.

By Rev Stat. sec. 4235, it is expressly enacted that "until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be," sub-

ject, however, to a prohibition (sec. 4237) against "any discrimination in the rate of pilotage or half-pilotage between vessels sailing between the ports of one State and vessels sailing between the ports of different States, or any discrimination against vessels propelled in whole or in part by steam;" and to a further restriction (sec. 4401) that "all coastwise seagoing vessels . . . shall be subject to the navigation laws of the United States, . . . and that every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats." To further effectuate its control over coastwise seagoing vessels, it is provided by sec. 4444 that "no State or municipal government shall impose upon pilots of steam vessels any obligation to procure a state or other license in addition to that issued by the United States. . . . Nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by this title," . . . although "nothing in this title shall be construed to annul or affect any regulation established by the laws of any State requiring vessels entering or leaving a port in any such State, *other than coastwise steam vessels*, to take a pilot duly licensed or authorized by the laws of such State, or of a State situated upon the waters of such State."

The general object of these provisions seems to be to license pilots upon steam vessels engaged in the *coastwise* or interior commerce of the country, and at the same time, to leave to the States the regulation of pilots upon all vessels engaged in *foreign* commerce.

This view was evidently accepted by the legislature of New York, which, in section 2119 of the Consolidated Act of 1882, declares that "no master of any vessel navigated under a coasting license and employed in the coasting trade by way of Sandy Hook, shall be required to employ a licensed pilot when entering or departing from the harbor of New York;" but reserving its own control of vessels engaged in the foreign trade by enacting further in the same section that "all masters of for-

eign vessels and vessels from a *foreign port*, and all vessels sailing under register bound to or from the port of New York or by the way of Sandy Hook, shall take a licensed pilot, or, in case of refusing to take such pilot, shall himself, owners or consignees, pay the said pilotage as if one had been employed, and such pilotage shall be paid to the pilot first speaking or offering his services as pilot to such vessel," with a final proviso that "this section shall not apply to vessels propelled wholly or in part by steam, owned or belonging to citizens of the United States, and licensed and engaged in the coasting trade."

As the statement of facts connected with the question certified shows that the Ponce was an American built steamship, sailing from New York, belonging to a New York corporation, enrolled and licensed for the coasting trade, navigated by a master duly licensed to act as pilot in the bay and harbor of New York, under the laws of the United States, and was engaged in trade between the Island of Porto Rico and the port of New York, the only question remaining to be considered is whether she was a *coastwise seagoing steam vessel* under Rev. Stat. sec. 4401, and actually employed in the coasting trade by way of Sandy Hook under sec. 2111 of the New York Consolidation Act.

Under the commercial and navigation laws of the United States merchant vessels are divisible into two classes: First, vessels registered pursuant to Rev. Stat. sec. 4131. These must be wholly owned, commanded and officered by citizens of the United States, and are alone entitled to engage in foreign trade; and, second, vessels enrolled and licensed for the coasting trade or fisheries. Rev. Stat. sec. 4311. These may not engage in foreign trade under penalty of forfeiture. Section 4337. This class of vessels is also engaged in navigation upon the Great Lakes and the interior waters of the country— in other words, they are engaged in domestic instead of foreign trade.

The words "coasting trade," as distinguishing this class of vessels, seem to have been selected because at that time all the domestic commerce of the country was either interior com-

merce, or coastwise, between ports upon the Atlantic or Pacific coasts, or upon islands so near thereto, and belonging to the several States, as properly to constitute a part of the coast. Strictly speaking Porto Rico is not such an island, as it is not only situated some hundreds of miles from the nearest port on the Atlantic coast, but had never belonged to the United States, or any of the States composing the Union. At the same time trade with that island is properly a part of the domestic trade of the country since the treaty of annexation, and is so recognized by the Porto Rican or Foraker act. By section 9 the Commissioner of Navigation is required to " make such regulations . . . as he may deem expedient for the nationalization of all vessels owned by the inhabitants of Porto Rico on April 11, 1899, . . . and for the admission of the same to all the benefits of the coasting trade of the United States; and the coasting trade between Porto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States." By this act it was evidently intended, not only to nationalize all Porto Rican vessels as vessels of the United States, and to admit them to the benefits of their coasting trade, but to place Porto Rico substantially upon the coast of the United States, and vessels engaged in trade between that island and the continent, as engaged in the coasting trade. This was the view taken by the executive officers of the government in issuing an enrollment and license to the Ponce, to be employed in carrying on the coasting trade, instead of treating her as a vessel engaged in foreign trade.

That the words " coasting trade " are not intended to be strictly limited to trade between ports in adjoining districts is also evident from Rev. Stat. sec. 4358, wherein it is enacted that " the coasting trade between the territory ceded to the United States by the Emperor of Russia, and any other portion of the United States, shall be regulated in accordance with the provisions of law applicable to such trade between any two great districts." These great districts were, for the more convenient regulation of the coasting trade, divided by the act of March 2, 1819, 3 Stat. 492, c. 48, as amended by the act of May 7, 1822,

3 Stat. 684; Rev. Stat. sec. 4348, as follows: "The first to include all the collection districts on the seacoast and navigable rivers between the eastern limits of the United States and the southern limits of Georgia; the second to include all the collection districts on the seacoast and navigable rivers between the river Perdido and the Rio Grande; and the third to include all the collection districts on the seacoast and navigable rivers between the southern limits of Georgia and the river Perdido." A provision similar to that for the admission of the Territory of Alaska was also adopted in the act to provide a government for the Territory of Hawaii, (31 Stat. 141, sec. 98,) which provides that all vessels carrying Hawaiian registers on August 12, 1888, and owned by citizens of the United States or citizens of Hawaii, "shall be entitled to be registered as American vessels, . . . and the coasting trade between the islands aforesaid and any other portion of the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts."

This use of the words "coasting trade" indicates very clearly that the words were intended to include the domestic trade of the United States upon other than interior waters. The District Court was correct in holding that the Ponce was engaged in the coasting trade, and that the New York pilotage laws did not apply to her.

*The second and third questions are therefore answered in the affirmative. An answer to the first question becomes unnecessary.*