THE QUEEN.

THE UMATILLA.

(Circuit Court of Appeals, Ninth Circuit. November 21, 1910. On Motion for Rehearing, March 11, 1911.)

Nos. 1,850, 1,851.

PILOTS (§ 7*)—POWER OF STATES TO CONTROL AND REGULATE—FEDERAL STATUTE—COASTWISE VESSELS.

The federal statutes (Rev. St. §§ 3126, 4401, 4444 [U. S. Comp. St. 1901, pp. 2036, 3016, 3037]) respectively authorize (section 3126) registered vessels of the United States to engage in the coastwise trade, with the privilege of touching at one or more foreign ports during the voyage; provide (section 4401) that all coastwise seagoing vessels shall be subject to the navigation laws of the United States, and every coastwise seagoing steam vessel subject to such laws "not sailing under register" shall when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats; and prohibit (section 4444) any state or municipal government from requiring pilots of steam vessels to procure a state or other license in addition to that issued by the United States, and from levying pilot charges upon any steamer piloted as provided therein, provided that "nothing in this title shall be construed to annul or affect any regulation established by the laws of any state requiring vessels entering or leaving any port of such state, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such state or of a state situate upon the waters of such state." Held, that the exception in section 4401 from those vessels thereby made subject to the pilotage laws and regulations of the United States of vessels "sailing under register" includes only such vessels engaged in foreign commerce, and that under such provisions, construed together, the state of California is without power to levy pilotage charges on registered vessels, entering or leaving the port of the San Francisco, which are engaged in making voyages between that port and Washington ports on Puget Sound in charge of pilots licensed under the laws of the United States, although on each of such voyages they make a brief call at the port of Victoria, B. C., for passengers, freight, and mails.

[Ed. Note.—For other cases, see Pilots, Dec. Dig. § 7.*]

Gilbert, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Northern District of California.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suits in admiralty by M. Anderson against the steamship Queen, and by N. Jordan against the steamship Umatilla; the Pacific Coast Steamship Company claimant. Decrees for respondent, and libelants appeal. Affirmed.

William Denman, for appellants.

Geo. W. Towle, for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. These cases were argued and submitted together. They are libels against the respective ships mentioned for alleged pilotage services. Both cases are alike, except that in that against the ship Umatilla a question is raised as to the sufficiency of the tender of the services sued for.

The cases were submitted upon an agreed statement of facts, from which it appears that the libelant in each case was, at all the times mentioned in the libel, a duly licensed pilot of the port of San Francisco, holding a license from the United States local inspectors of steamships, and also one from the California State Board of Pilot Commissioners, of the port of San Francisco; that the libelant in the case of the Queen tendered to the master of that steamship, as she was entering the port of San Francisco on the 14th day of August, 1905, his services as a pilot, which services were refused; that the steamer Queen was at the time a duly registered American vessel, and was then completing a voyage from an American port on Puget Sound to the port of San Francisco, via Victoria, British Columbia, and for some time prior thereto had been engaged in making voyages between the port of San Francisco and American ports on Puget Sound, and that on each and every of such voyages the port of Victoria, British Columbia, was a regular port of call, being the first port of call on each voyage outward from San Francisco, and the last port of call on each voyage toward San Francisco from the American ports on Puget Sound; that the steamship Umatilla was, at all of the times mentioned in the libel against that ship, a duly registered American vessel, engaged in making similar voyages, and, being about to sail on her regular voyage from San Francisco to the ports of Puget Sound, the libelant in that case tendered to the master of the ship—

"his, said Jordan's, services as a pilot so licensed, to pilot said Umatilla on her then voyage out of said port of San Francisco, by going on board said vessel alongside the wharf to which said steamship was then made fast, and not more than one hour before she was to and did sail on her voyage therefrom, and then and there orally stating to said master that he, said Jordan, was then and there ready and able and willing to so pilot said vessel, and that he, said Jordan, then desired that he be so employed."

The agreed statement shows these further facts:

"(4) That each of said vessels in said several libels mentioned was, at all of the times in said libels and schedules referred to or mentioned, a duly registered American steam vessel; and was at all said times sailing under 'register'; and each of said vessels at each of the several times in said several libels and schedules referred to was either on a voyage from the port of San Francisco in the state of California to a United States port on Puget

Sound, or from a United States port on Puget Sound to said port of San Francisco, but in either such case said vessel did, while en route between said ports in the United States, stop at the port of Victoria, B. C., to and from which said port of Victoria she did then carry, and did then and there deliver and receive, both passengers, mail, and freight; and on each and every such voyage the port of Victoria, B. C., was a regular port of call, being the first port of call or stop on each voyage outward from San Francisco, California, and the last port of call or stop on each voyage toward San Francisco, California. Each and every one of the ships in this agreement mentioned, on sailing outward bound from the port of San Francisco on her said voyage above described, displayed at her foremast head the English flag, which indicated, according to the usage and custom of vessels and their navigators, that she was destined to a port under the dominion of Great Britain, whose merchant flag was so as aforesaid displayed at her foremast head; and similarly on each and every said inward voyage above described, each and every one of the vessels in this agreement mentioned displayed the English flag on her foremast head, to indicate that she had come direct from a port under the dominion of that country.

"(5) That each of the masters and first officers of each of said vessels, at all of the times in said several libels and schedules referred to, was duly licensed under the laws of the United States of America to act as and serve as master and as pilot of any American steam vessel in entering and in departing from the said port of San Francisco, and all of the engineers and other officers of each of said vessels, who under the laws of the United States needed then to be licensed, were then duly licensed officers thereof; and each of said masters, during the two years next prior to any of the times in said libels referred to, had many times safely, and without the assistance of any pilot licensed under authority of the state of California, navigated and piloted vessels under his command, then sailing under 'register,' and of the class of those in said libels and said schedules referred to, out of and into said port of San Francisco.

"(6) That no master of any vessel owned or employed by either of said claimants, and sailing under 'register,' had ever, during the twenty (20) and more years next prior to any of the times in said libels referred to, accepted the services of any of said libelants, nor of any state licensed pilot, to pilot any such vessel out of or into said port of San Francisco: and during all of the times herein last referred to each of said libelants and all state licensed pilots well knew that their services as pilots licensed by the state of California to so pilot any such vessel would not, if tendered, be availed of or accepted by either or any of the masters of such vessel, nor by either or by any of said claimants.

"(7) That each and every and all of the said vessels, in said several libels or in any schedule hereto attached referred to, was, long prior to any of the times in said several libels or schedules referred to, well known to each and every and all of said libelants, and to all state licensed pilots of the said port of San Francisco; that said several vessels sailed from and arrived at San Francisco on a regular schedule, and could be and were by each and all of said libelants, and all state licensed pilots, identified and known in approaching the port of San Francisco long before he or any pilot needed or, in the ordinary course of his business, would make any effort to 'speak' the same, if such vessel were by him thought to be in need of a pilot.

"(8) That when the present state pilotage regulations of the port of San Francisco were under consideration by the Legislature of the state of California, the state licensed pilots of said port appeared before each of the committees of said Legislature having such matters in charge, and then by themselves and by their representatives were heard in connection with such regulations, and were likewise so heard by the Governor of said state before the act of the Legislature fixing such regulations, as now embodied in certain sections of the Political Code, was approved by him; and the fact long before then had been, and then was, and since then has been, and still is, that the only steam vessels that had been or were engaged in the coasting trade, touching en route at a foreign port, and sailing under 'register' out of or into the said port of San Francisco, were such of the vessels of said claimants,

to wit, Pacific Coast Steamship Company, or the Pacific Company, as had been and were so employed."

The answer in each case set up that the steamship referred to in it, during all the times mentioned, was a duly registered steam vessel of the United States, and then was and during many months prior thereto had been continuously employed in the carriage of persons and property between the port of San Francisco, Cal., and the ports of Port Townsend, Seattle, Tacoma, Everett, Anacortes, South Bellingham, and Bellingham, all in the state of Washington, and in like business when returning to San Francisco; that during all of said times the said ship was a coastwise steam vessel of the United States then engaged in interstate coastwise commerce and transportation, and during all of said times was under the command of a master who then held a pilot's license or certificate that had been theretofore duly and regularly issued to him by the proper and competent authorities of the United States, and which said pilot's license authorized the said master under the pilot laws of the United States to pilot any and all enrolled or registered steam vessels of the United States, including the steamship in question, into and out of the port of San Francisco, and that the chief officer of the said steamship also held, during all of the said times, a similar pilot's license, which said licenses were then in full force, and that all the engineers of the said steamship were duly and regularly licensed by the proper United States authorities as required by the United States statutes, which licenses were in full force, and that each of the several officers of said ship had taken the oath of office prescribed by statute; that the said ship on its regular voyages between the port of San Francisco and the Puget Sound ports of the United States touched en route at the port of Victoria, British Columbia, and there received on board passengers and freight for carriage thereon, the stop and stay of the ship at Victoria for such purpose being about one hour only, which stop the ship was authorized to make by the clearances granted at the United States custom house; that the number of passengers and the amount of freight taken on board at Victoria were insignificant as compared with the number of passengers and amount of freight taken on board at the American ports mentioned and transported by the steamship to and from the said American ports.

The record in each case shows that the services sued for were never in fact rendered, and that the acceptance of the proffered services was expressly refused by the respective steamships, and that the real question in each case is whether these registered steamships of the United States, plying between the American ports mentioned and making a brief incidental stop at the British port of Victoria, were compelled to accept the services at the port of San Francisco of a state pilot of California.

We are of opinion that the court below rightly held that they were not. On behalf of the appellants it is suggested that the alleged error on the part of that court arose because it failed to remember that the existing statutes of the United States upon the subject were enacted for the "better protection of the lives of passengers." The learned

judge of the court below could hardly have been unmindful of the fact that the primary purpose of all pilotage laws is the safety of persons on board the vessels to be piloted. Nor is it true, as contended on behalf of the appellants, that unless the existing statutes of the United States be so construed as to make coastwise vessels sailing under "register" subject to the compulsory pilot laws of the state, such coastwise seagoing vessels will necessarily be exempt from the requirements of any pilot law. The authority of a state to provide for and regulate pilot charges at ports within its territorial limits, in so far as such provisions and regulations do not conflict with the legislation of Congress, is unquestioned. But it is just as true that to the extent of any such conflict state legislation is invalid.

In title 52 of the Revised Statutes of the United States, for the regulation of steam vessels, it is provided, among other things, that every vessel propelled in whole or in part by steam, shall be deemed a steam vessel within its meaning, and that all steam vessels navigating any waters of the United States which are common highways of commerce, or open to general or competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of that title. Specific provisions are therein made for the licensing of masters and pilots of domestic steam vessels, and against the navigation of such vessels by any one not so licensed, and a supervising general inspector, supervising inspectors, and local inspectors are provided for to see that none but competent persons are granted such licenses.

"Whenever any person claiming to be a skillful pilot for steam vessels offers himself for a license," declares section 4442 of the Revised Statutes (U. S. Comp. St. 1901, p. 3037), "the inspectors shall make diligent inquiry as to his character and merits, and if satisfied from personal examination of the applicant, with the proof that he offers, that he possesses the requisite knowledge and skill, and is trustworthy and faithful, they shall grant him a license for the term of one year to pilot any such vessel within the limits prescribed in the license; but such license shall be suspended or revoked upon satisfactory evidence of negligence, unskillfulness, inattention to the duties of his station, or intemperance, or the willful violation of any provision of this title."

And section 4443 of the same statutes (page 3037) provides that:

"Where the master or mate is also pilot of the vessel, he shall not be required to hold two licenses to perform such duties, but the license issued shall state on its face that he is authorized to act in such double capacity."

By section 4438 (page 3034) it is provided as follows:

"Sec. 4438. The boards of local inspectors shall license and classify the masters, chief mates, engineers, and pilots of all steam vessels. It shall be unlawful to employ any person, or for any person to serve, as a master, chief mate, engineer, or pilot on any steamer, who is not licensed by the inspectors; and anyone violating this section shall be liable to a penalty of one hundred dollars for each offense."

Merchant vessels are, under the commercial and navigation laws of the United States, divisible into two classes—registered vessels, and vessels enrolled and licensed for the coasting trade or fisheries. But

by virtue of sections 3126 and 4361 of the Revised Statutes (U. S. Comp. St. 1901, pp. 2036, 2980) registered vessels may also engage in the coastwise trade—those sections providing:

"Sec. 3126. Any vessel, on being duly registered in pursuance of the laws of the United States, may engage in trade between one port in the United States and one or more ports within the same, with the privilege of touching at one or more foreign ports during the voyage, and land and take in thereat merchandise, passengers and their baggage, and letters, and mails. All such vessels shall be furnished by the collectors of the ports at which they shall take in their cargoes in the United States, with certified manifests, setting forth the particulars of the cargoes, the marks, number of packages, by whom shipped, to whom consigned, at what port to be delivered, designating such merchandise as is entitled to drawback, or to the privilege of being placed in warehouse; and the masters of all such vessels shall, on their arrival at any port of the United States from any foreign port at which such vessel may have touched, as herein provided, conform to the laws providing for the delivery of manifests of cargo and passengers taken on board at such foreign port, and all other laws regulating the report and entry of vessels from foreign ports, and be subject to all the penalties therein prescribed."

"Sec. 4361. Whenever any vessel of the United States, registered according to law, is employed in going from any one district in the United States to any other district, such vessel, and the master thereof, with the goods she may have on board previous to her departure from the district where she may be, and also upon her arrival in any other district, shall be subject, except as to the payment of fees, to the same regulations, provisions, penalties, and forfeitures, and the like duties are imposed on like officers, as are provided for vessels licensed for carrying on the coasting trade. Nothing herein contained shall be construed to extend to registered vessels of the United States having on board merchandise of foreign growth or manufacture, brought into the United States, in such vessel, from a foreign port, and on which the duties have not been paid according to law."

There is in the two sections last quoted express statutory authority for engaging in the coastwise trade by registered vessels; and the agreed statement of facts in the present cases leaves no room to doubt that the steamships here in question were mainly engaged in that traffic, stopping only incidentally, and for a very brief period, at the foreign port of Victoria, at which port they take on a very small portion of their passengers and cargo.

The provisions of the United States statutes show that provision is made by the general government for proper pilots for all domestic vessels, whether registered or licensed, engaged in the coastwise trade, and that no such vessels can engage therein without such a pilot aboard. It is, therefore, a mistake to say, as does the proctor for the appellant, that unless registered vessels engaged in the coastwise trade be subjected to the compulsory law of the state, such vessels are not subject to any pilotage law.

"By Rev. St. § 4235 [U. S. Comp. St. 1901, p. 2903]," said the Supreme Court in the case of Huus v. New York & Porto Rico Steamship Company, 182 U. S. 392, 393, 394, 21 Sup. Ct. 827, 828 (45 L. Ed. 1146), "it is expressly enacted that 'until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be,' subject, however, to a prohibition (section 4237 [page 2903]) against 'any discrimination in the rate of pilotage or half-pilotage between vessels sailing between the ports of one state and vessels sailing between the ports of different states, or any discrimination against vessels propelled in whole or in part by steam,' and to a further restriction (section

4101 [page 3016]) that 'all coastwise seagoing vessels * * * shall be subject to the navigation laws of the United States, * * * and that every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats.' To further effectuate its control over coastwise seagoing vessels, it is provided by section 4444 [page 3037] that 'no state or municipal government shall impose upon pilots of steam vessels any obligation to procure a state or other license in addition to that issued by the United States, * * * nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by this title,' * * * although 'nothing in this title shall be construed to annul or affect any regulation established by the laws of any state requiring vessels entering or leaving a port in any such state, *other than coastwise steam vessels*, to take a pilot duly licensed or authorized by the laws of such state, or of a state situated upon the waters of such state.' The general object of these provisions seems to be to license pilots upon steam vessels engaged in the *coastwise* or interior commerce of the country, and at the same time to leave to the states the regulation of pilots upon all vessels engaged in *foreign* commerce."

See, also, Olsen v. Smith, 195 U. S. 332, 25 Sup. Ct. 52, 19 L. Ed. 224; Spraigue v. Thompson, 118 U. S. 95, 6 Sup. Ct. 988, 30 L. Ed. 115.

Since the foregoing opinion was prepared, our attention has been called by the appellants' proctors to three rulings of the Treasury Department, the first made October 24, 1879, the second February 12. 1884, and the third November 29, 1884, which, it is claimed, sustain the appellants' contention. The first was in response to a letter from a pilot holding a license from the United States local inspectors asking whether his right to pilot certain steamers in and out of Narragansett Bay could be interfered with by state pilots—such steamers plying between Boston and Philadelphia, and touching at Providence, a purely coastwise service, so far as appears from the inquiry. The answer was that no state pilot could interfere with the pilot holding a United States license, "if said steamers are exclusively confined to the coastwise trade and are not sailing under register."

The second letter of the Department referred to was evidently in answer to an inquiry of one holding a license under the general government, and reads:

"You are informed that a United States pilot's license gives you authority to pilot any river or coastwise steamer upon the waters for which it is granted, but it does not confer any rights to pilot a sail vessel or registered steamer, namely, 'one bound to or from a foreign port'; the pilotage of the latter class of vessels being regulated by the state laws, if there are any."

The third and last letter of the Department referred to announces the same ruling, and in these words:

"A United States license gives you authority to pilot any river or coastwise steamer upon the waters for which it is granted, but it does not confer any rights to pilot a sail vessel, or registered steamer, namely, one bound to or from a foreign port; the pilotage of the latter class of vessels being regulated by the state laws, if there be any."

The meaning of "registered" vessels, as used by the Department, was expressly stated in its last two letters mentioned to be "one bound to or from a foreign port." It is hardly to be supposed that it meant

anything else in the first letter referred to by the use of the same word "register." Now it is obvious that a vessel sailing from one American port on the Pacific Coast to another American port on the same coast is not "bound to or from a foreign port," although it makes an incidental stop en route at a foreign port. The agreed statement of facts in the present cases shows that each of the vessels in question was, at the several times in the several libels and schedules referred to, either on a voyage from the port of San Francisco, in the state of California, to a United States port on Puget Sound, or from a United States port on Puget Sound bound to the port of San Francisco. In each case the *voyage* was between those domestic ports, with an incidental brief stop en route at the British port of Victoria, such incidental touching being expressly authorized by section 3126 of the Revised Statutes of the United States, referred to in the foregoing opinion, and which we repeat, so far as pertinent:

"Any vessel, on being duly registered in pursuance of the laws of the United States, may engage in trade between one port in the United States and one or more ports within the same, with the privilege of touching at one or more foreign ports during the voyage. * * *"

In each of the cases above entitled the judgment is affirmed.

WOLVERTON, District Judge. I concur in the opinion of Judge ROSS, rendered herein, and will state briefly my reasons therefor. The question in the case is one purely of construction, and relates to the federal statutes regulating pilotage; the controversy being whether pilotage upon libelee's steamships in entering and departing from the Bay of San Francisco is controlled by federal or state regulations.

The statute of California (section 2468, Pol. Code) provides that all foreign vessels and all vessels from a foreign port or bound thereto, and all vessels sailing under a register between the port of San Francisco and any other port of the United States, shall be liable for pilotage as provided in section 2466 of the Code. Section 4401 of the Revised Statutes of the United States, after setting forth that all coastwise seagoing vessels shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof, and all vessels, propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam vessels in passing, provides that:

"Every coastwise seagoing steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the inspectors of steamboats."

Section 4444 provides that:

"No state or municipal government shall impose upon pilots of steam vessels any obligation to procure a state or other license in addition to that issued by the United States, or any other regulation which will impede such pilots in the performance of the duties required by this title; nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by this title; and in no case shall the fees charged for the pilotage of any steam vessel exceed the customary or legally established rates in the

state where the same is performed. Nothing in this title shall be construed to annul or effect any regulation established by the laws of any state requiring vessels entering or leaving a port in any such state, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such state, or of a state situate upon the waters of such state."

The controversy depends upon the meaning and signification to be given the words "not sailing under register," as employed in section 4401. Preliminarily, it may be stated that Congress, having the power to regulate commerce between the states, is vested with authority as an instrument of that power to regulate the pilotage service upon the rivers and harbors and bays wherever the jurisdiction of Congress extends; but the state was originally possessed of authority to regulate pilotage service, and may lawfully do so until Congress has assumed to legislate upon the subject, and to inaugurate its own regulations pertaining thereto. Prior, therefore, to the enactment of any federal statutes upon the subject, pilotage upon the bays and harbors and inland waters of the country was regulated solely by state authority, and it is only as the federal statutes have encroached upon state authority that the latter has been curtailed or superseded. Furthermore, it is a canon of statutory interpretation that every word and phrase of a statute shall be given a meaning, if it can be done in reason, that where different regulations are imposed by the same act, the entire statute shall be construed in pari materia, and that, where apparently inconsistent provisions are found, they must be harmonized if possible.

Under this rule, we must give a meaning to the clause in question, and that meaning must be determined by the intendment of Congress in adopting the law if it can be ascertained. It is my firm impression that the words "not sailing under register" were not intended to modify or qualify the words "every coastwise seagoing steam vessel," but that they were employed rather as descriptive of such vessel; their purpose being to distinguish such coastwise seagoing steam vessel from one that is engaged in foreign trade. This idea is borne out when we take into consideration the provision of section 4444 whereby the intendment is shown not to annul any regulation established by the laws of the state requiring vessels entering or leaving a port in any such state, other than coastwise steam vessels, to take a pilot duly licensed by the laws of the state. The words "not sailing under register" are wholly omitted from this section; whereas, if it was intended that such vessels sailing under register should be subject to state regulation, it is more than probable that Congress would have reiterated the words. This section, it will be observed, deals directly with a restriction upon state legislation; the former (section 4401) is for the regulation of the navigation of certain craft or vessels.

It is difficult to harmonize these two sections upon any other basis than the one which I have suggested, and the meaning of section 4401 is simply this: That all coastwise steam vessels not engaged in foreign commerce and trade shall be subject to the pilotage laws and regulations enacted by Congress. Other vessels engaged in foreign trade would still be subject to the local laws and regulations pertaining thereto. This idea is borne out by the opinion of Mr. Justice Brown

in Huus v. New York & Porto Rico Steamship Company, 182 U. S. 392, 21 Sup. Ct. 827, 45 L. Ed. 1146. This was the case of the navigation of a steamship, enrolled and licensed, plying between the port of New York and that of San Juan in the island of Porto Rico. Prior, however, to a discussion of that case, it should be further observed that vessels registered in pursuance of the laws of the United States "may engage in trade between one port in the United States and one or more ports within the same, with the privilege of touching at one or more foreign ports during the voyage, and land and take in thereat merchandise, passengers and their baggage, and letters, and mails." Section 3126, Rev. St. So that a registered vessel, it would appear, is entitled to engage in the coastwise trade.

In the case alluded to it is stated that, under the commercial and navigation laws of the United States, merchant vessels are divided into two classes: First, vessels registered pursuant to Rev. St. § 4131 (U. S. Comp. St. 1901, p. 2803), being those wholly owned, commanded, and officered by citizens of the United States, which are alone entitled to engage in foreign trade; and, second, vessels enrolled and licensed for the coasting trade or fisheries. The latter may not engage in foreign trade upon penalty of forfeiture. Section 4337 (page 2969). After referring to the several sections of the Revised Statutes, namely, 4235, 4237, 4401, and 4444, the distinguished justice makes this significant deduction, namely:

"The general object of these provisions seems to be to license pilots upon steam vessels engaged in the coastwise or interior commerce of the country, and at the same time to leave to the states the regulation of pilots upon all vessels engaged in foreign commerce."

It is significant, also, that in quoting from section 4444 the words "other than coastwise steam vessels" are italicized, thus emphasizing the deductions that the jurist has drawn from these statutes.

Following this case is another, bearing the title of Olsen v. Smith, 195 U. S. 332, 25 Sup. Ct. 52, 49 L. Ed. 224, in which it was determined that:

"The effect of Rev. St. §§ 4237, 4444, is not to interfere with or abrogate state laws regulating pilotage, but to withdraw coastwise steam vessels from the pilotage charges imposed by such state laws."

I have quoted from the headnote in this decision.

In a previous case, Spraigue v. Thompson, 118 U. S. 90, 6 Sup. Ct. 988, 30 L. Ed. 115, which it should be stated involves the question of a licensed steamship plying between the ports of Philadelphia, Pa., and Savannah, Ga., it was held that she was not subject to the local pilotage regulations. The court, in discussing the case, says, among other things, that:

"The section [being section 4444] expressly excepts coastwise steam vessels from the regulations established by the laws of any state requiring vessels entering or leaving a port in any such state to take a pilot duly licensed or authorized by the laws of any such state, or of a state situate upon the waters of such state."

While these cases do not expressly decide the question in issue, and while it might be said that in the first case what the court observed was

obiter, as not necessary for the decision of that case, yet the observation of the learned justice was made in view of a consideration of the very statutes in question here, and is entitled to very great weight. In the case of Bigley v. New York & P. R. S. S. Co. (D. C.) 105 Fed. 74, after quoting the last clause of section 4444, the court says:

"The effect of the above acts of Congress is to exempt all steam vessels sailing under a license and employed in the coastwise trade from the pilotage laws of the states, while other vessels remain subject to the state laws."

This case is one of three, including the case of Huus against the same party, which was appealed to the Supreme Court of the United States, being first cited herein. While the language used does not include coastwise vessels not sailing under register, yet it seems to be general in its import, as comprising all coastwise steam vessels, and is not in conflict with the observations of the Supreme Court on the same subject.

In the case of Joslyn v. Nickerson (C. C.) 1 Fed. 133, the steamship was registered, but was plying between Boston and Havana, being thus engaged in foreign trade, and it was held that the state regulations of Massachusetts as to pilotage applied. The case is not inconsistent, therefore, with the views herein entertained.

The case of Murray v. Clark, 4 Daly (N. Y.) 468, affirmed by the Court of Appeals of New York, 58 N. Y. 684, supports the opposite doctrine; but it does not appeal to me as controlling.

Sections 4401 and 4444 of the Revised Statutes were enacted into law in 1871, and it does not seem to have occurred to any one in the port of San Francisco to contest the right of the United States authorities to regulate the pilotage as it respects steam vessels plying in the coastwise trade until a recent statute was enacted by the state of California in 1905 (St. 1905, c. 611). In all the time preceding that we must assume that the pilots upon such vessels were such as were licensed by United States authority, and not by state authority. And where a statute has continued so long under one construction, it is persuasive of its rightful interpretation.

For these reasons, I am of the opinion that the cause should be affirmed.

GILBERT, Circuit Judge (dissenting). The question involved in this case depends wholly upon the construction of sections 4401 and 4414 of the Revised Statutes. In those two sections is to be found the full measure of congressional legislation on the subject of pilotage, and the full extent of the federal delimitation of state power. Section 4361, which appears under a different title, and which subjects registered vessels engaged in the coasting trade to the same regulations, provisions, penalties, forfeitures, and duties as are imposed on licensed vessels in the coasting trade, has no reference whatever to pilotage regulations. This is made plain by referring to the original act of February 18, 1793 (1 Stat. 313, c. 8, § 20), in which it specifically appears that the regulations, provisions, duties, etc., so referred to, concern only the carriage of goods and more particularly distilled liquors, and the duty of masters to make manifests thereof. No new meaning was given to that statute by carrying its provisions into the

Revised Statutes as section 4361. "It will not be inferred that the Legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed" (United States v. Ryder, 110 U. S. 729, 4 Sup. Ct. 196, 28 L. Ed. 308), and "upon a revision of statutes, a different interpretation is not to be given to them without some substantial change of phraseology" (McDonald v. Hovey, 110 U. S. 619, 4 Sup. Ct. 142, 28 L. Ed. 269). And it is an established canon of construction that, in finding the meaning of a statute in the revision, the courts are permitted to refer to the original statute from which the section was taken to ascertain from its language and context to what class of cases the provision was intended to apply. The Conqueror, 166 U. S. 122, 17 Sup. Ct. 510, 41 L. Ed. 937.

It is to be borne in mind that, while federal authority over pilotage is paramount to that of the state, the state power does not act by authority delegated by Congress, and the question is, not what has Congress authorized the states to do, but what has Congress taken from the states by its own regulation of pilotage? In Gibbons v. Odgen, 9 Wheat. 207, 6 L. Ed. 23, it was said:

"Although Congress cannot enable a state to legislate, Congress may adopt the provisions of a state on any subject. When the government of the Union was brought into existence, it found a system for the regulations of its pilots in full force in every state. The act which has been mentioned (Act Aug. 7, 1789, c. 9, § 4, 1 Stat. 54, re-enacted in section 4235, Rev. St.) adopts this system and gives it the same validity as if its provisions had been specially made by Congress. * * * The act unquestionably manifests an intention to leave this subject entirely to the states until Congress should think proper to interpose."

In Cooley v. Board of Wardens of Philadelphia, 12 How. 299, 319, 13 L. Ed. 996, the court said:

"The act of 1789 contains a clear and authoritative declaration by the First Congress that the nature of this subject is such that, until Congress should find it necessary to exert its powers, it should be left to the legislation of the states; that it is local, and not national; that it is likely to be the best provided for, not by one system or plan of regulations, but by as many as the legislative discretion of the several states should deem applicable to the local pecularities of the ports within their limits."

Approaching the question in issue with these principles in mind, it seems clear to me that section 4401 places under the protection of federal licensed pilots, except when on the high seas, all coastwise steam vessels, "not sailing under register," and that while section 4444 recognizes the power of the state to regulate pilotage, when entering or leaving its ports, of all vessels other than "coastwise steam vessels," the coastwise steam vessels so excluded from state legislation are those and those only which are placed under federal regulation under section 4401, namely, coastwise steam vessels, "not sailing under register." Section 4401 is the only federal statute placing vessels under the control of federal pilots while entering or leaving ports, and section 4444, being part of the same statute, is to be construed with it. Both these sections originally appeared as a single section in the act of 1871, entitled "An act for the better protection of life, etc." Act Feb. 28, 1871, c. 100, § 51, 16 Stat. 455. The field of legislation which Congress might have covered by pilotage regulations comprised three

classes of vessels: First, licensed and enrolled vessels engaged in the coasting trade; second, registered vessels engaged partly in coasting trade and partly in foreign commerce; and, third, registered vessels engaged wholly in foreign trade. Congress saw fit to regulate vessels of the first class only, and has never made any specific provision for vessels of the other two classes. It has left them to state regulation.

This was the view taken by Judge Lowell in 1880, in Joslyn v. Nickerson (C. C.) 1 Fed. 133, when he said, referring to Act July 25, 1866, c. 234, § 9, 14 Stat. 228:

"This statute has been modified, and the employment of such a pilot is now compulsory only upon coasting steam vessels not sailing under a register. Rev. St. § 4401."

And the learned judge cited Murray v. Clark, 4 Daly, 468, affirmed in 58 N. Y. 684, a case in which the meaning of sections 4401 and 4444 was discussed at length, and in which it was held that the state might impose a pilotage charge on registered vessels which are also engaged in the coasting trade, and that the rules and regulations established by the United States refer only to coastwise steamgoing vessels, not sailing under register. In Bigley v. New York P. R. S. S. Co. (D. C.) 105 Fed. 74, Judge Brown said that the effect of sections 4401 and 4444 was—

"to exempt all steam vessels sailing under a license and employed in the coastwise trade from the pilotage laws of the states, while other vessels remained subject to the state laws."

This seems to be the view which was taken in Spraigue v. Thompson, 118 U. S. 90, 6 Sup. Ct. 988, 30 L. Ed. 115; and the later cases of Huus v. New York, etc., S. S. Co., 182 U. S. 395, 21 Sup. Ct. 827, 45 L. Ed. 1146, and Olsen v. Smith, 195 U. S. 332, 25 Sup. Ct. 52, 49 L. Ed. 224, are not in conflict with it.

On Motion for Rehearing.

PER CURIAM. It is ordered that the petition, filed January 26, 1911, on behalf of the appellant, for a rehearing of the above-entitled cause be and hereby is granted. It is further ordered that certain questions involved in the above-entitled cause be certified to the Supreme Court of the United States for decision, and that the counsel for the respective parties to the above-entitled cause may each propose a certificate accordingly.