UNITED STATES *v.* WESTERN OPERATING CORP. (NO. 4574) [1]

United States Court of Customs and Patent Appeals, November 29, 1947

*Paul P. Rao*, Assistant Attorney General (*Sybil Phillips*, special attorney, of counsel), for the United States.

*Jerome G. Clifford* for appellee.

[1] C. A. D. 373.

72

[Oral argument October 9, 1947, by Miss Phillips and Mr. Clifford]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal by the United States from a judgment of the United States Customs Court, Third Division, C. D. 1036, which sustained appellee's protest and directed the Collector of Customs at the port of New York to reliquidate the entry and refund the amount of duties assessed and collected by him upon the cost of certain equipment and repairs incurred by appellee at the port of Gothenburg, Sweden, in the conversion there of the steamship *Ulysses* from an oil tanker into a floating factory for the purpose of· engaging in the whale fishery.

It appears from the record that an application for the documentation of the *Ulysses* was made on January 18, 1937 and, based upon the statement contained respectively in the required "Ownership Oath" and "Master's Oath" that the vessel was to be used in the service of "Whale Fishery," the Collector of Customs at the port of New York issued to the Western Operating Corporation a certificate of registry, "Permanent Register No. 93," plaintiff's collective Exhibit 1. Upon the face of the register it was noted that the tanker had surrendered her previously issued certificate of enrollment and license for the stated reason that "property and trade changed, and service changed."

The vessel cleared with that register from the port of Chester, Pennsylvania, made the voyage to Sweden in water ballast, without freight, cargo or passengers, and there was converted into a floating whale factory.

Thereafter she engaged in whaling voyages for two consecutive seasons; the first to the whaling grounds at Shark Bay, West Australia, from July 24 to October 8, 1937, and the second to the Antarctic from December 8, 1937, to March 15, 1938.

Leaving the whaling grounds, the *Ulysses* proceeded directly to New York, and upon arrival and entry at that port in April, 1938, the duty on the cost of the equipment and repairs incidental to her alteration in the Kingdom of Sweden was assessed by the collector.

The entry was liquidated at an ad valorem duty of 50 per centum on the cost of such equipment and repairs under section 466 of the Tariff Act of 1930, which, so far as pertinent, reads:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.
Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:
"Sec. 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States,

be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country;  *  *  *.

In its protest appellee claimed that the cost of repairs and equipment furnished to the *Ulysses* at Gothenburg was not dutiable for the reason that the vessel was not documented under the laws of the United States to engage in the foreign or coasting trade, or intended to be employed in such trade, nor had it actually been so employed. Appellee further claimed that the certificate of registry documented the vessel to engage in the whale fishery and, hence, the involved cost of equipment and repairs in a foreign port were not subject to the payment of any duties under section 466.

Having received the protest hereinbefore described, the collector reviewed his original decision and adhered thereto, stating in his memorandum, among other things, that "The *Ulysses* was at the time of the repairs operating under certificate of registry to engage in foreign trade and in the whale fisheries."

Section 466, *supra*, does not expressly provide for the assessment of duty upon the cost of equipment and repairs incurred in a foreign port by a registered vessel.   The statute is specific to the cost of such items incurred in a foreign port by vessels documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade.

The record discloses that the *Ulysses* was built within the United States and was wholly owned by a corporation organized and chartered under the law of the State of Delaware, the president and managing directors of which were citizens of the United States.   It is not disputed that since more than 75 per centum of the stock of the corporation was owned by aliens, the vessel could not have engaged in the coasting trade under the provisions of sections 11 and 802 (a), title 46, of the United States Code.

Furthermore, no duty is assessed by the terms of the statute upon the cost of equipment and repairs incurred in a foreign port by a vessel documented under the laws of the United States to be employed "in the whale fisheries," and appellant concedes in its brief that while vessels may be enrolled and licensed pursuant to law for both the coasting trade and the fisheries (46 U. S. C., sec. 263), vessels documented solely for the purpose of engaging in the fisheries are excluded from the provisions of section 466.

Therefore, the fundamental question is whether the *Ulysses* under the certificate of registry hereinbefore described was documented under the laws of the United States to engage in the foreign trade within the purview of the statute.

Appellant contends that the vessel, having been registered under the laws of the United States, "the possession of a certificate of registry *ipso facto established* her right to engage in foreign trade"; and "the fact that the Ulysses did not actually engage in foreign trade and that

the owners did not intend so to employ her, are irrelevant considerations." [Italics quoted.]

Appellant contends further that under such certificate, and on the same voyage, the vessel was also specially authorized to engage in the whale fisheries pursuant to the provisions of the United States Code, title 46, chapter 12, section 280, which reads as follows:

§ 280. Papers for vessels in whale fishery. All vessels which may clear with registers for the purpose of engaging in the whale fishery shall be deemed to have lawful and sufficient papers for such voyages, securing the privileges and rights of registered vessels, and the privileges and exemptions of vessels enrolled and licensed for the fisheries. [R. S. § 4339.]

In addition to section 466, the trial court cited and quoted the provisions of 12 different statutes relative to the issue presented. In view of that fact, it is deemed unnecessary to restate herein the provisions of each of those statutes.

No statute has been cited either by the trial court or by the appellant, and we know of none, which, in terms, specifically defines the type of trade in which a registered vessel may lawfully engage. There are certain statutes and decisions relating to registry and enrollment of vessels, however, which over a long period of years have been cited as authoritatively defining the peculiar rights and privileges conferred by the documentation of vessels in their respective pursuits.

Those statutes and decisions disclose that the Congress while encouraging and protecting a vessel in the pursuit of the employment for which she was documented pursuant to law, also prevents by serious penalties the misuse of the papers issued for one employment from interfering with those issued for another or different employment.

The specific statutes and certain of the decisions hereinbefore referred to are: Act of December 31, 1792, 1 Stat. 287, 46 U. S. C. 221; Act of February 18, 1793, 1 Stat. 305, 46 U. S. C. 251; *The Sloop Active* v. *United States*, 7 Cranch 99; *The Mohawk*, 3 Wall. 566, 571; *Badger* v. *Gutierez*, 111 U. S. 734, 736, 737; *Huus* v. *New York and Porto Rico Steamship Company*, 182 U. S. 392, 395; *Anderson* v. *Pacific Coast S. S. Co.*, 225 U. S. 187, 199, 200; *United States* v. *Rogers et al.*, Case No. 16, 189, 27 Fed. Cases 890.

The documentation of vessels and the law governing the same was clearly summarized in the case of *Anderson* v. *Pacific Coast S. S. Co.*, *supra*, decided in 1905, to the following effect:

American vessels are of two classes, those registered, and those enrolled and licensed. "The purpose of a register is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found. The purpose of an enrolment is to evidence the national character of a vessel engaged in the coasting trade or home traffic, and to enable such vessel to procure a coasting license. The distinction between these two classes of vessels is kept up throughout the legislation of Congress on the subject, and the word register is invariably used in reference to the one class and enrolment, in reference to the other." *The Mohawk*, 3 Wall. 566, 571. See *Huus* v. *New*

*York & Porto Rico Steamship Co.*, 182 U. S. 392, 395. The act of December 31, 1792 (1 Stat. 287, c. 1), applicable exclusively to vessels engaged in foreign commerce and to their registry, and the act of February 18, 1793 (1 Stat. 305, c. 8), relating to vessels engaged in the coasting trade and fisheries, and to their enrollment, constituted the basis for the regulations of the two classes. * * *

Section 280 was derived from the Act of April 4, 1840, 5 Stat. 370, c. 6, which was enacted by Congress following the decision by the court in *United States* v. *Rogers et al., supra.*

In that case the brig *Troy* cleared with a registry for the purpose of engaging in a whaling voyage, and while so engaged upon the high seas the crew endeavored to revolt. Upon return of the vessel to the United States, Rogers, the leader of the revolt, and other seamen were indicted.

The court dismissed the indictment for the stated reason that it was not supported by the facts, and in so doing held that no registered ship can lawfully engage in the whale fisheries; and that such a vessel engaged in a whaling voyage, without surrendering her certificate of registry and without taking out an enrollment and license pursuant to the provisions of the Act of 1793, *supra*, had no rights as an American vessel.

In rendering its decision the court also stated that the statute treats a vessel not so enrolled and licensed, if found engaged in the whale fisheries, as liable to pay the same fees and tonnage in every port of the United States as vessels not belonging to citizens of the United States and, under certain circumstances, the vessel and its lading become liable to forfeiture.

The language of section 280 is clear and unambiguous, but to understand the problem confronting Congress and the solution thereof by its members in the enactment of the legislation from which that section was derived, it is necessary to refer to the legislative history of the Act of 1840, reported in U. S. Senate Documents, 26th Congress, 1st Session, Vol. 2, Doc. 12 and Vol. 3, Doc. 83.

Those documents disclose that at the time of the decision in the case of *Rogers et al., supra*, not less than 300 vessels were absent from the United States with registers for the purpose of engaging in whaling voyages; and that the crews of such vessels comprised 7,500 members, officers and men, each of whom was jointly interested with the owners in the proceeds of the oil obtained on such voyages as compensation for his services in obtaining it.

In consequence of the decision the Comptroller of the Treasury issued a circular letter to the collectors of customs in which he stated to them that under the decision, and until Congress had an opportunity to legislate upon the subject, they had no alternative but to exact tonnage duty and alien duty on the cargo, if it be subject to duty, upon the entry of a vessel registered for the purpose of engaging

in the whaling fisheries, if it came into port without an enrollment and license.

That circular was a source of concern to those whose interests were involved in the whale fishery. A committee of owners and mariners of ships was organized by the citizens of New Bedford and of Nantucket, Mass., members of which memorialized the President of the United States for the purpose of obtaining immediate relief from the proposed action of customs officials.

In presenting their plea it was brought out that although the Act of 1792, *supra,* applied exclusively to the registry of vessels engaged in foreign trade, and despite the fact that no statute authorized a registered vessel to engage in whaling voyages, the erroneous practice obtained among customs officials for forty years prior to the involved decision of issuing a certificate of registry instead of an enrollment and license to vessels setting sail for the purpose of engaging in the whale fishery.

In that connection the committee of New Bedford, as reported at pages 7 and 8, Doc. 12, *supra,* made the following pertinent statements:

\* \* \* It is probable that this mode of papering ships employed in the whale fisheries, was adopted when the more extended enterprise of those engaged in its pursuit, protracted their voyages beyond the term for which licenses were granted, and rendered a resort to foreign or very distant ports indispensable to the health of the crews, and the procurement of the necessary supplies for their ships. It was doubtless supposed by the officers of the Government, that vessels sailing under a register, the document which had usually been presented in such ports as the evidence of their national character, would be more certain to be respected and protected as American property, than if furnished with the enrolment and license which, until very recently, have not been accompanied by the sea letters or the Mediterranean passport.

\*        \*        \*        \*        \*        \*        \*

We have never insisted on having registers for our vessels, but have taken such papers as the collectors have given us, when requested to clear our vessels on whaling voyages, and have always received a clearance from the custom-house, in which it was expressed that the vessels were bound on such voyages, clearly evincing that the Government officers conceived that said vessels were authorized to engage in the hazardous undertakings; and we have always felt, in sending them away on the most distant voyages, that we had the full approbation of the Government, and that they, with us, joined heartily in wishes for the success of business, which has always claimed the favorable regard of all civilized Governments, and by many of them considered the proper objects of national bounties.

We would not believe, although we heard it rumored, that it was the intention of the Government to demand penalties of the owners and crews of vessels thus employed, until the receipt of the circular of the Comptroller of the Treasury, dated the 6th inst.

Pending the action of Congress relative to the matter, officials of the Treasury Department did all in their power to mitigate the effects of the decision in the case of *Rogers et al.* Asserting, among other

things, that the Act of September 1, 1789, which was antecedent to those in force at the time of the decision, most clearly authorized a vessel either to be registered or licensed, or enrolled and licensed for the whale fisheries, as the master or owner might elect, the Comptroller of the Treasury wrote, as reported at page 14, Doc. 83, *supra*, that—

* * * in my opinion, to obviate the recurrence of present difficulties, the only thing necessary to be done is, to procure the passage of an act reviving that feature in the one of 1789, authorizing the registering or enrolling and licensing of vessels to be employed in the whale fisheries, and making the license to depend for its legal existence on the same condition with the register.

The action taken by Congress on the subject was embodied in the Act of 1840, *supra*. In view of the sharply defined issue in the case at bar, we quote the language of that act, italicizing the words in the first provision thereof which, when read together, constitute the complete language of section 280, *supra:*

CHAP. VI.—*An Act to cancel the bonds given to secure duties upon vessels and their cargoes, employed in the Whale Fishery, and to make registers, lawful papers for such vessels.* (b)

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That *all vessels which* have cleared, or hereafter *may clear, with registers for the purpose of engaging in the Whale fishery, shall be deemed to have lawful and sufficient papers for such voyages, securing the privileges and rights of registered vessels, and the privileges and exemptions of vessels enrolled and licensed for the fisheries;* and all vessels which have been enrolled and licensed for like voyages shall have the same privileges and measure of protection as if they had sailed with registers if such voyages are completed or until they are completed.

SEC. 2. *And be it further enacted,* That all the provisions of the first section of the act entitled "An act supplementary to the act concerning consuls and vice-consuls, and for the further protection of American seamen," passed on the twenty-eighth day of February, Anno Domini eighteen hundred and three, shall hereafter apply and be in full force as to vessels engaged in the Whale fishery in the same manner and to the same extent as the same is now in force and applies to vessels bound on a foreign voyage.

SEC. 3. *And be it further enacted,* That all forfeitures, fees, duties and charges of every description required of the crews of such vessels, or assessed upon the vessels or cargoes, being the produce of such fishery, because of a supposed insufficiency of a register to exempt them from such claims, are hereby remitted; and all bonds given for such cause are hereby cancelled, and the Secretary of the Treasury is hereby required to refund all such moneys as have been, or which may be, paid into the Treasury, to the rightful claimants, out of the revenues in his hands.

Approved, April 4, 1840.

It is noted that Congress in the enactment of the Act of 1840 amended the Act of February 28, 1803, 2 Stat. 203, "for the further protection of American seamen," by making such act applicable to vessels engaged in the whale fishery in the same manner and to the same extent as such act was then in force and applicable to vessels bound on a foreign voyage.

Congress did not however amend the Act of 1792 or the Act of 1793. What it did was to enact a new and separate law which applied exclusively to a particular class of vessel engaged in the whale fishery, and in so doing preserved intact the two prior acts which, as hereinbefore described, applied exclusively and respectively to vessels engaged in the foreign or coasting trade.

. Congress did not provide in the new act that vessels with registers may clear for the whale fishery, but that vessels which cleared or may clear with a register for the purpose of engaging in the whale fishery shall be deemed to have lawful and sufficient papers for such voyages.

Congress further secured to such vessels the privileges and rights of registered vessels and the privileges and exemptions of vessels enrolled and licensed for the fisheries, and thereby endowed them, in accordance with the respective Acts of 1792 and 1793, with the status of vessels of the United States entitled to the benefits and privileges appertaining thereto for the purpose of engaging in the whale fishery, and not for the purpose of engaging in the foreign or coasting trade.

Sections 221 and 251 of the United States Code, *supra*, so far as pertinent, were respectively derived, in substantially the same language, from the Acts of 1792 and 1793, *supra*, and like section 280, *supra*, were in force and effect throughout the period of time when the matters here involved were transacted. These sections are therefore applicable to the question here in issue, but upon that point are subject to the construction that has been placed upon the respective acts from which they were derived. · · · · ·

It clearly appears that the foreign trade and the whale fishery, from a legal standpoint and otherwise, are essentially different employments, and that the intention of Congress down through the years has been that the employment of vessels should be indicated by the documents possessed by them.

· Prior to the enactment of section 280, a register was the lawful documentation for a vessel engaged in the foreign trade, and an enrollment and license was the lawful documentation for a vessel engaged in the whale fishery. Section 280, however, made a register a lawful documentation under the laws of the United States for a vessel engaged in the whale fishery.

The exception thereby provided in favor of such a vessel, and the possession by her of a register for the purpose of engaging in the whale fishery, did not, however, "*ipso facto*" establish her right to engage in foreign trade, but, on the contrary, established only her right to engage in the whale fishery. Therefore, the *Ulysses*, which was so documented, was excluded from the provisions of section 466, *supra*. · · · · ·

Appellant cites authority to the effect that the purpose of section 466 is evidently the encouragement of American labor, and we find no fault with its contention on that point. The purpose of section 280 is evidently for the encouragement of those engaged in the American whale fishery, and, as hereinbefore described, "for the further protection of American seamen."

In view of our conclusion, it is deemed unnecessary to state and pass upon other arguments presented herein, and the judgment of the United States Customs Court is accordingly *affirmed*.