SAIPAN STEVEDORE COMPANY
INCORPORATED, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS;
**Helal Uddin, Respondents.**

No. 96–70836.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1997.

Decided Jan. 6, 1998.

Traylor T. Mercer, Agana, Guam, for petitioner.

Joshua T. Gillelan, II, Office of Workers' Compensation, Washington, DC, for respondent.

Before: REINHARDT, LEAVY and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this case, we consider the extent to which a Congressional Act follows the flag. Specifically, we are required to decide whether the Longshore and Harbor Workers' Compensation Act applies to the Commonwealth of the Northern Mariana Islands.

We hold that it does and affirm the Benefits Review Board.

## I

The events precipitating this appeal began in June 1987, with an errant ship derrick and an injured stevedore. Helal Uddin was unloading a container on the *Pacific Rim* which was docked on the Island of Saipan in the Commonwealth of the Northern Mariana Islands. The derrick suddenly malfunctioned, loosening wire runners and sending a large brass container hook pedulating uncontrollably. Uddin jumped to avoid the violently swaying clasp and severely injured his back. Unable to walk for a month, he left his employment with appellant Saipan Stevedore Company, Inc. ("Saipan Stevedore") and obtained lighter work as a security guard.

■ Uddin filed for compensation benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.*, in 1990. At the time of the accident, the Commonwealth had no general workers' compensation law.[1]

■ Saipan Stevedore contested the claim, arguing that the Act did not apply to the Commonwealth. In November 1992, an Administrative Law Judge ("ALJ") denied Saipan Stevedore's motion to dismiss for lack of jurisdiction and held that the Act applied to the Commonwealth. After a hearing on the merits, the ALJ awarded benefits to Uddin. On appeal, the Benefits Review Board affirmed the ALJ's jurisdictional determination.[2] This timely appeal followed. We have jurisdiction under 48 U.S.C. § 1823, and review this question of law de novo. *Torres–Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).

---

1. This has since changed. *See* 4 C.M.C. § 9302 (1994). The exclusive remedy provisions of the Commonwealth scheme do not specify claims in admiralty. *See* 4 C.M.C. § 9305 (1994). Thus, the new Commonwealth workers' compensation law and the Act can co-exist as forecasted by the Supreme Court in *Calbeck v. Travelers Ins. Co.*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962).

2. The Benefits Review Board was established by the 1972 amendments to the Act. It is empowered "to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under (the Act)." 33 U.S.C. § 921(b)(1), (3).

## II

On its face, the jurisdictional reach of the Longshore and Harbor Workers' Compensation Act seems plain enough. It includes the "several States and Territories and the District· of Columbia, including the territorial waters thereof." [3] 33 U.S.C. § 902(9). Because the Commonwealth is a United States territory, completion of the syllogism should end the inquiry. However, Saipan Stevedore urges us to explore the nuances of the noun "territory" in its historic context. Because appellant's position is founded on that examination, we shall. However, at journey's end we are left where we began, and conclude that Congress meant what it said.

## A

The Northern Mariana Islands are a chain of thirteen single islands and one group of three small islands located in the western Pacific Ocean near Guam. The total land surface is about 185 square miles; the three largest islands are Saipan (47 square miles), Tinian· (39 square miles) and Rota (32 square miles). The Northern Mariana Islands are north of Guam and approximately 3900 miles west of Honolulu. The current population is estimated at near 60,000.[4]

Spain controlled the islands from the sixteenth century until the Spanish–American war. In 1898, after the war ended, Spain ceded Guam to the United States and sold the rest of the Marianas chain to Germany. Germany's brief control ended with the commencement of World War I when Japan took possession of all islands except Guam. After World War I, Japan continued to govern most of what is now considered Micronesia, including the Northern Mariana Islands, under a mandate from the League of Nations.

By the end of World War II, most of the Micronesian islands were occupied by the United States military. In 1947, the United Nations designated Micronesia a "strategic trust territory" and appointed the United States as trustee.[5] During the trusteeship period, the United States had the power to apply federal laws in the Northern Mariana Islands, but did so only to a limited extent. Under the Trusteeship system, the United States was "placed in a temporary guardian relationship with the trust territories for the purpose of fostering the well-being and development of the·territories into self-governing states." [6] Under the Trust Agreement, citizens of the Northern Mariana Islands were not citizens or nationals of the United States.

In the early 1970s, the Northern Marianas ideologically diverged from the rest of Micronesia and sought a closer, more permanent relationship with the United States. In 1975, negotiations resulted in a legislative-executive agreement which redefined the political relationship between the United States and the Commonwealth. The *Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America* ("Covenant"), ratified by Congress by joint resolution,[7] established the Commonwealth as an unincorporated territory of the United States.[8] *See* 48 U.S.C. § 1801 and note; *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir.1990). The Cove-

---

3. 33 U.S.C. § 902(9) provides in full that: "The term 'United States' when used in a geographical sense means the several States and Territories and the District of Columbia,̈ including the territorial waters thereof."

4. Stanley K. Laughlin, Jr., *The Law of the United States Territories and Affiliated Jurisdictions*, 425–26 (1995 & Supp.1997).

5. Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947,. U.S.-N. Mar. I., art. 3, 61 Stat. 3301, 3302. The United States terminated the Trusteeship for the NMI, the Federated States of Micronesia, and the Marshall Islands on November 3, 1986. Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986). · A full

discussion of the history of the Trust Territory can be found at *Gale v. Andrus*, 643 F.2d 826, 828–30 (D.C.Cir.1980).

6. *See* Harry G. Prince, The United States, the United Nations, and Micronesia: Questions of Procedure, Substance, and Faith, 11 Mich. J. Int'l L. 11, 20 (1989).

7. *See* H.R.J. Res. 549, 94th Cong., 1st Sess. (1975).

8. For a complete discussion of the background of the negotiations between the Northern Mariana Islands and the United States, see Arnold H. Leibowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l L.J. 19 (1981).

nant governs the relationship between the United States and the Commonwealth.[9] *U.S. ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749, 754 (9th Cir.1993). The Covenant provides that the "United States may enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands." Covenant, § 105. In effect, the Covenant acknowledges Congressional power over territories as provided in the Constitution's territorial clause which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art IV, § 3. However, although the territorial clause provides the Constitutional basis for Congress' legislative authority in the Commonwealth, it is by the Covenant that we measure the limits of that power. *Richards*, 4 F.3d at 754.

The general application of federal statutes to the Commonwealth contains one proviso: if congressional legislation is not applicable to the states, the Commonwealth must be specifically named in the legislation to be effective in the Northern Marianas. *Id.*

The extent to which federal laws enacted prior to January 9, 1978 affect the Commonwealth is governed by § 502 of the Covenant, found at 48 U.S.C. § 1801:

(a) The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

(1) ...

(2) those laws not described in paragraph (1) which are applicable to Guam and which are of general application to the several States as they are applicable to the several States;

Thus, previously enacted laws which are of general application to the States and which

apply to Guam, apply to the Northern Mariana Islands.

 The Covenant codifies the Commonwealth's determination that its legal rights and obligations more closely parallel those of the residents of Guam, rather than any other United States territory. American "rule" over the Commonwealth of the Northern Mariana Islands derives its legitimacy from the consent of the Northern Mariana people and from our national respect for the unique customs and values that have developed over hundreds of years. As a result, to the extent not expressly covered by the Covenant, the interpretation and application of federal laws under Covenant § 502 must take into account these historical and cultural considerations.

### B

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 ("Act" or "LHWCA"), was adopted in 1927 in order to provide workers' compensation for non-crew-member maritime workers, particularly longshoremen. Enactment was prompted by the Supreme Court's decision in *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), which held that the individual States were without power to extend their workers' compensation laws to longshoremen "injured on the gangplank between a ship and a pier." *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 257, 97 S.Ct. 2348, 2353–54, 53 L.Ed.2d 320 (1977). Thus, longshoremen injured on the land side of a vessel or pier fell within the protection of state workers' compensation schemes, but those injured on the seaward side of the pier were without a remedy. *Jensen* held that states could not cover those workers because of the exclusive federal jurisdiction over admiralty and maritime matters.

---

**9.** As stated in the Senate Report accompanying adoption of the 1976 Covenant, "[a]lthough described as a commonwealth, the relationship is territorial in nature with final sovereignty invested in the United States and plenary legislative authority vested in the United States Congress. The essential difference between the Covenant

and the usual territorial relationship, ... is the provision in the Covenant that the Marianas constitution and government structure will be a product of a Marianas constitutional convention, as was the case with Puerto Rico ..." S.Rep. No. 596, 94th Cong., 2d Sess. 2 (1976), reprinted in 1976 U.S.Code Cong. & Ad. News 448, 449.

Congress appeared determined to remedy this inequity. However, its initial attempts were rebuffed by the Supreme Court as improper delegations of admiralty jurisdiction.[10] Recognizing that comprehensive reform was required, Congress passed the Act, which created a national compensation statute that covered longshoremen and those performing maritime repair work on navigable waters.

### III

■ Given the history of the Northern Mariana Islands and the legislation, we conclude that the Act must apply to the Commonwealth.

■ First, the Act's plain language supports such a construction. If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Indeed, "if the intent of Congress is clear, that is the end of the matter." *Id.* at 842, 104 S.Ct. at 2781.

The Act on its face applies to the "several State and Territories and the District of Columbia including the territorial waters thereof." 33 U.S.C. § 902(9). Congress did not qualify the word "territories", nor place any geographic or temporal restrictions on it. Thus, under a "plain reading" analysis, the Act should apply to the Commonwealth.

Second, the Act applies to Guam, which was a territory at the time of enactment. *Tyndzik v. Director, Office of Workers Compensation Programs,* 53 F.3d 1050, 1052 (9th Cir.1995)("The LHWCA defines the term 'States' to include territories"). The Covenant provides that pre-Covenant federal laws which are of general application to the States and which apply to Guam, apply to the

Northern Mariana Islands. 48 U.S.C. § 1801. Thus, under the analysis mandated by the Covenant, the Act must apply to the Commonwealth. Further, the application of the Act to the Commonwealth would not be inconsistent with the purposes of the trusteeship agreement or the Covenant. Petitioner has presented no evidence and made no argument to suggest that providing a uniform compensation remedy for longshoremen and maritime employees is incompatible with the history or culture of the Commonwealth.

Third, the Act has been given a broad construction. The Supreme Court confirmed the Act's expansive scope in *Calbeck v. Travelers Ins. Co.,* 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), holding that "Congress intended to exercise to the fullest extent all the power and jurisdiction it had over the subject matter" under the United States' admiralty authority, with no "restrictions on federal coverage short of the limits of maritime jurisdiction." *Id.* at 130, 82 S.Ct. at 1205. The legislative history verifies that the Act was intended to cover all maritime workers within the jurisdictional reach of the United States. Indeed, the Act contains a section on presumptions, one of which provides that claims shall be presumed to come within the provisions of the Act. 33 U.S.C. § 920(a). The Supreme Court has held that the Act is to be liberally construed in favor of injured employees. *Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 91–92, 98 L.Ed. 5 (1953); *see also Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977) (the Act is to be construed in a way that avoids harsh or incongruous results); *Metropolitan Stevedore Co. v. Brickner,* 11 F.3d 887, 889 (9th Cir.1993) (holding that the Act should be liberally construed in conformance with its purpose and in a way that avoids harsh or incongruous results). The Fifth Circuit has held that the presumption of coverage ap-

---

**10.** In its first attempt to remedy *Jensen*, Congress amended the jurisdictional provision in the Judicial Code to allow "claimants the rights and remedies under the workmen's compensation law of any state." *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 156 n. 1, 40 S.Ct. 438, 439 n. 1, 64 L.Ed. 834 (1920). The Supreme Court found this improper, holding that admiralty and maritime law was entrusted to Congress "to be

dealt with according to its discretion—not for delegation to others." *Id.* at 164, 40 S.Ct. at 441; *see also State of Washington v. W.C. Dawson & Co.,* 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924) (striking down Congress' second attempt at amending the 'savings to suitors' clause because the power to amend, alter, or revise the maritime law may not be delegated).

plies to jurisdictional issues, as well as to questions regarding the nature and extent of injury. *See New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031 (5th Cir.1981). This reasoning is consistent with the concerns that led to the passage of the Act.

■ Further, the Act contains a clear indication of congressional intent to apply extraterritorially, including the high seas. *Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 73 (2d Cir.1994). The *Kollias* court found that Congress' "overriding purpose in enacting the LHWCA was to provide consistent workers' compensation coverage to eligible longshore and harbor workers, a goal that would be frustrated by limiting the LHWCA to territorial application." *Id.* at 74. A central purpose underlying the Act was to create a uniform compensation system in which a "longshoreman's or harbor worker's coverage did not depend on the precise site of his injury." *Id.* Thus, construing the Act to apply to an accident in the Northern Mariana Islands is completely consistent with Congressional intent.

Fourth, applying the Act to the Commonwealth is consistent with our general rules for construing the application of federal statutes to territories. We have construed the term "Territory" broadly. *Micronesian Telecommunications Corp. v. NLRB*, 820 F.2d 1097, 1100 (9th Cir.1987). The Supreme Court has explained that the test for the reading of "territory" is whether Congress would have varied the language in the statute if it had foreseen the acquisition of the territory at issue. *People of Puerto Rico v. Shell Co.*, 302 U.S. 253, 257, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937). Employing this standard, the Supreme Court concluded in *U.S. v. Standard Oil Co. of Cal.*, 404 U.S. 558, 559, 92 S.Ct. 661, 662, 30 L.Ed.2d 713 (1972), that the Sherman Act was applicable to American Samoa, whose status as an unincorporated territory was similar to the Commonwealth's position in this case. Similarly, we held in *Micronesian Telecommunications Corp.* that the National Labor Relations Act was applicable to the Commonwealth, despite

the fact that the islands were not among the territories enumerated in the statute. Given that the history of the Act indicates a congressional intent to provide all maritime workers with a general workers' compensation remedy, it is very unlikely that Congress would have somehow exempted Guam or the Northern Mariana Islands from its coverage if it had the appropriate foresight back in 1927 when the Act was passed. Indeed, Congress's clear intent to apply the Act expansively leads to the opposite conclusion.

■ Fifth, the Director of the Workers' Compensation Program has construed the Act to apply to the Commonwealth. The agency's legal interpretation of the Act's jurisdictional reach is entitled to some weight by this Court. *Mallott & Peterson v. Director, OWCP*, 98 F.3d 1170, 1172 (9th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997). Our traditional deference to agency interpretations is based on our respect for the special competence of an administrative agency to interpret a statutory provision concerning its own area of expertise. *See Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 844–845, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). The jurisdictional reach of the Act does not implicate that special competence, however, and the Director's position is not otherwise entitled to special deference because the Board is not a policy-making body. *See Nealon v. California Stevedore & Ballast Co.*, 996 F.2d 966 (9th Cir.1993). Still, we do defer to the Director's interpretation of the Act to one degree or another in most cases. *Id.* In this case, the Director's interpretation is reasonable and further supports our ultimate conclusion. *See Stevens v. Director, OWCP*, 909 F.2d 1256, 1257 (9th Cir.1990) (the Board's interpretation of the Act is entitled to respect by this court only if it is reasonable and reflects the policy underlying the statute.) [11]

Thus, although we could rest with the plain statutory language, every other interpretive tool supports the conclusion that the Act applies to the Commonwealth.

---

**11.** The agency initially took a contradictory position as to whether the Act applied to Guam, as Saipan Stevedore appropriately notes. However, the agency's position on the Act's application to the Commonwealth has remained consistent since 1983.

## IV

 We respectfully disagree with the statutory interpretation urged by Saipan Stevedore. First, Saipan Stevedore argues that the use of the proper noun ("Territories") in the statutory definition of the Act shows that Congress did not intend for the Act to extend to unincorporated territories. We rejected a very similar argument in *Kanazawa Ltd. v. Sound, Unlimited,* 440 F.2d 1239 (9th Cir. 1971), in holding that the use of 'Territory' with a capital "T" in the Arbitration Act did not mean that Congress meant to exclude Guam. The *Kanazawa* court noted that Congress had not used the lowercase 't' exclusively when writing legislation dealing specifically with Guam. Section 502(a)(2) of the Covenant provides that if the Act applies to Guam, it applies to the Commonwealth. Thus, *Kanazawa* is persuasive authority that the use of the capitalized "T" does not preclude the Act from applying to the Commonwealth. *See also Puerto Rico v. Shell Co.,* 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937) (holding that the use of "Territory" in the Sherman Anti–Trust Act was meant in its most comprehensive sense and included Puerto Rico).

Similarly, we have found other statutes to be applicable to the Commonwealth when the statute in question applied to "any State or Territory." *See Fleming v. Department of Public Safety, Com. of Northern Mariana Islands,* 837 F.2d 401 (9th Cir.1988) (finding 42 U.S.C. § 1983 applicable to the Northern Mariana Islands in light of its application to any "Territory" and its applicability in Guam); *Misch v. Zee Enterprises, Inc.,* 879 F.2d 628 (9th Cir.1989) (finding that the Jones Act applied in the Commonwealth in part because language in the Federal Employers' Liability Act that was incorporated into the Jones Act applies in the "Territories" and "other possessions" of the United States).

Saipan Stevedore places too much significance on the distinction between incorporated and unincorporated territories in the *Insular Cases.*[12] In these cases, the Supreme Court analyzed the extent to which the Constitution applies to new United States territories. The Court ultimately concluded that the answer depended on the status of the territory, whether it was destined for statehood, and whether the constitutional right in question was fundamental. The *Insular Cases* involved constitutional challenges to the application of Congressional acts to territories; the *Insular Cases* did not bear on the issue of Congress's plenary legislative power in the territories as provided in the Constitution's territorial clause. No constitutional challenge is at issue here. Our only consideration is the jurisdictional reach of the statute. Thus, the constitutional distinctions made between incorporated and unincorporated territories in the *Insular Cases* are not germane to our inquiry.

Second, Saipan Stevedore argues that Puerto Rico's status as construed by the First Circuit militates against applying the Act to the Northern Mariana Islands. The First Circuit has determined that the Act does not apply to Puerto Rico because the Act was displaced by the local Puerto Rican compensation scheme. *See Garcia v. Friesecke,* 597 F.2d 284 (1st Cir.1979). We note, however, that the Second Organic Act of Puerto Rico gives that territory the power to alter maritime law by legislation. *See Guerrido v. Alcoa Steamship Co.,* 234 F.2d 349, 354–55 (1st Cir.1956). Neither Guam, the Virgin Islands, nor the Commonwealth has received a similar grant of power. *See*

12. *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901) (Puerto Rico is not a foreign country and import duties levied on sugar were illegal); *Goetze v. United States,* 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901) (Hawaii and Puerto Rico are not foreign countries within the meaning of tariff law); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901) (military authority to establish duties on American imports to Puerto Rico ceased with the ratification of the treaty ceding the territory to the United States); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901) (post-treaty duties on imports are recoverable under *Dooley* ); *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (revenue clauses of the Constitution are inapplicable to Puerto Rico); *Huus v. New York & Porto Rico S.S. Co.,* 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901) (steamship operating between New York and Puerto Rico is not subject to state pilotage laws because it is not engaged in foreign trade).

*Misch,* 879 F.2d 628 (9th Cir.1989) (holding that the Jones Act is applicable to the Commonwealth and finding that the Organic Act governing Puerto Rico is substantively and significantly different from the Covenant governing United States—Commonwealth relations.) [13] Thus, *Garcia* is consistent with our interpretation of the Act's applicability to the Commonwealth.

Finally, Saipain Stevedore claims that the Act's application to the Commonwealth is foreclosed by the Commission on Federal Laws. The Covenant provided for the creation of a Commission on Federal Laws "to survey the laws of the United States and make recommendations to ... Congress as to which laws of the United States not applicable to the Northern Mariana Islands should be made applicable and to what extent and in what manner, and which applicable laws should be made inapplicable and to what extent and in what manner." *See* Covenant § 504. The final report of the Commission did not mention the Act. The Covenant does specify, however, that the recommendations of the Commission were to be guided by the "potential effect of each law on local conditions within the Northern Mariana Islands, the policies embodied in the law and the provisions and purposes of the Covenant." *Id.* The Commission itself also explained that its analysis was guided by two main questions: (1) is the law necessary and proper for carrying out the Covenant, and (2) is the law inconsistent with the right of self-government over local and internal matters reserved to the people of the Commonwealth in Section 103? [14]

■ We do not consider the Act to be "necessary and proper" for carrying out the

Covenant, but we do find it to be conceptually consistent with the goals of United States involvement in the Commonwealth. One of the Covenant's goals was to end the economic stagnation of the Trusteeship era and introduce a standard of living comparable to that enjoyed in the United States. To this end, the United States has provided the Commonwealth with lucrative financial aid packages for capital improvements. The Commonwealth is also eligible for all federal programs provided to the fifty states and territories, such as nutrition assistance, medicaid, legal aid services, and the social security program.[15] The protection of workers through a workers' compensation scheme is completely consistent with blossoming economic development; indeed, as modern economies develop, the debate over the terms and conditions of employment inevitably intensifies.[16] Holding the Act applicable to the Commonwealth serves the economic interests of both employers and workers and furthers the development goals of both signatories to the Covenant. As a final matter, there is nothing in the Act itself or that we can foresee in its application that conflicts with the Commonwealth's right of self-government over local and internal matters.

Thus, none of Saipan Stevedore's arguments dissuade us from our determination that the Act applies to the Commonwealth.

## CONCLUSION

■ For all of these reasons, we conclude that "Territory" as the term is used in the Act is comprehensive and that Congress intended the Act to apply to the fullest extent possible with no restrictions on federal cover-

13. The Third Circuit, on the other hand, has held that the Act applies to the Virgin Islands. *Peter v. Hess Oil Virgin Islands Corp.,* 903 F.2d 935 (3d Cir.1990) (noting that the Virgin Islands are seen in the same light as a state, the Act was meant to apply to territories, and federal maritime law does not preempt application of any state workers' compensation laws).

14. *See* The Final Report for the Northern Mariana Islands Commission on Federal Laws to the Congress of the United States. CNMI Reports Vol. I, p. 1G (1991).

 Section 103 of the Covenant reads: "The people of the CNMI will have the right of local self-

government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption."

15. *See* Marybeth Herald, *The Northern Mariana Islands: A Change in Course under its Covenant with the United States,* 71 Or. L.Rev. 127, 138–39 (1992).

16. *See* Marybeth Herald, *supra* note 15; Greg Holloway, *The Effort to Stop Abuse of Foreign Workers in the U.S. Commonwealth of the Northern Mariana Islands,* 6 Pac. Rim. L. & Pol'y J. 391 (1997).

age "short of the limits of maritime jurisdiction." *Calbeck,* 370 U.S. at 125, 82 S.Ct. at 1202. Thus, we hold that the Act applies to the Commonwealth of the Northern Mariana Islands.

AFFIRMED.