**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KELLER FOUNDATION/CASE
FOUNDATION; ACE USA/ESIS,
                    *Petitioners,*

v.

JOSEPH TRACY; GLOBAL
INTERNATIONAL OFFSHORE LTD.;
LIBERTY MUTUAL INSURANCE
COMPANY; DIRECTOR, OFFICE OF
WORKERS' COMPENSATION
PROGRAMS; U.S. DEPARTMENT OF
LABOR,
                    *Respondents.*

No. 11-71703

OWCP No. 08-0119

JOSEPH TRACY, JR.,
                    *Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS; U.S.
DEPARTMENT OF LABOR; GLOBAL
INTERNATIONAL OFFSHORE LTD.;
LIBERTY MUTUAL INSURANCE CO.;
KELLER FOUNDATION, INC./CASE
FOUNDATION CO.; ACE USA/ESIS,
                    *Respondents.*

No. 11-71800

OPINION

On Petition for Review of an Order
of the Benefits Review Board,
U.S. Department of Labor

11599

Argued and Submitted
May 9, 2012—Portland, Oregon

Filed September 20, 2012

Before: A. Wallace Tashima, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

---

## COUNSEL

Joshua T. Gillelan II (argued), Longshore Claimants' National Law Center, Washington, DC; Eric A. Dupree, Dupree Law, APLC, Coronado, California, for petitioner-appellant Joseph Tracy.

Robert E. Babcock (argued), Holmes Weddle & Barcott, P.C., Lake Oswego, Oregon, for petitioners-appellants Keller Foundation/Case Foundation and ACE USA/ESIS.

James P. Aleccia (argued), Aleccia, Socha & Mitani, Long Beach, California, for respondents-appellees Global International Offshore Ltd. and Liberty Mutual Insurance Company.

Jonathan P. Rolfe (argued), M. Patricia Smith, Rae Ellen James, Mark A. Reinhalter, Sean Bajkowski, U.S. Department of Labor, Office of the Solicitor, Washington, DC, for respondent-appellee Director, Office of Workers' Compensation Programs.

---

## OPINION

IKUTA, Circuit Judge:

Joseph Tracy appeals the Benefits Review Board's determination that injuries he incurred in part during his employment by Global International Offshore Ltd. from 1998 to 2002 were not covered under the Longshore and Harbor Workers' Compensation Act (referred to as LHWCA, or the Act).[1] Because

---

[1] The LHWCA is administered by the Office of Workers' Compensation Programs, which is under the purview of the Department of Labor. *See* 20

we hold that no portion of Tracy's employment during this period satisfied the Act's status and situs tests, we affirm.

I

The LHWCA provides workers' compensation coverage for maritime employees engaged in longshoring and harbor work and similar operations. The question in this case is whether Tracy qualified for coverage under the Act during the period in which he worked for Global, his last employer. This question is crucial for Global because of the "last employer rule," which determines which employer is liable for compensating an employee covered under the Act. Under this rule, even if the claimant suffered an injury while working for a prior employer, if a "subsequent injury aggravated, accelerated or combined with claimant's prior injury, thus resulting in claimant's disability," the subsequent employer is responsible for the full amount of the compensatory award. *Found. Constructors, Inc. v. Dir., Office of Workers Comp. Programs*, 950 F.2d 621, 624 (9th Cir. 1991) (quoting *Kelaita v. Dir., Office of Workers' Comp. Programs*, 799 F.2d 1308, 1311 (9th Cir. 1986)) (internal quotation marks omitted).

It is undisputed that Tracy was covered by the Act during his previous employment with Keller Foundation, and that Tracy's disability stemmed from cumulative trauma he experienced during his separate stints with Keller and Global. Under the last employer rule, then, if Tracy were covered by the Act while working for Global, Global would be responsible for paying the full award owed to Tracy under the Act. If not, then Keller would be responsible.[2]

---

C.F.R. § 701.201; 20 C.F.R. § 1.1. The Department of Labor's Benefits Review Board (BRB) reviews appeals from the decisions of administrative law judges that arise under various statutes, including the LHWCA. *See* 33 U.S.C. § 921(b); 20 C.F.R. § 801.102.

[2]Tracy is joined by Keller in this appeal. To avoid confusion, we refer to appellant as Tracy.

We now briefly review the Act's history and purposes, which provide essential insight to the tests we must apply in determining whether the Act covers Tracy's employment with Global.

A

The LHWCA is best understood as a legislative effort to fill a narrow, albeit troublesome gap between two well-established remedial schemes for injured workers: the Jones Act, which covers "seamen," and state-based workers' compensation programs, which cover non-maritime, land-based workers. Although the Jones Act does not explicitly define "seamen," the Supreme Court has made clear that this term refers to employees who are part of a ship's crew, thus excluding harbor workers.[3] *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 355-56 (1995). Likewise, the Supreme Court has held that states cannot extend their workers' compensation programs to cover harbor workers, either on their own initiative or under authorization from Congress, due to paramount federal authority over all matters involving maritime law. *See Washington v. W.C. Dawson & Co. (Dawson's Case)*, 264 U.S. 219, 227 (1924); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 164 (1920); *S. Pac. Co. v. Jensen*, 244 U.S. 205, 217 (1917). It was thus left to Congress to fill this remedial gap by federal statute, which it did in 1927 by passing the LHWCA. *See* Act of Mar. 4, 1927, ch. 509, 44 Stat. 1424, U.S.C. §§ 901-50.

---

[3]Traditional principles of admiralty law ensured that seamen would receive "maintenance and cure" from their employers when injured, *see The Osceola*, 189 U.S. 158, 169 (1903), rights that were later codified and extended in the Jones Act. *See* Act of June 5, 1920, ch. 250, 41 Stat. 988 (codified at 46 U.S.C. §§ 30104-05). Because the seamen covered by the Jones Act preferred their traditional remedies to LHWCA coverage, Congress excepted them from coverage in the original LHWCA. *See* 1A BENEDICT ON ADMIRALTY § 7, at 1-11 (7th rev. ed. 2011) (citing Act of March 4, 1927, ch. 509, 44 Stat. 1424, 33 U.S.C. §§ 901-50).

For nearly five decades after the LHWCA's enactment, however, courts struggled to define when an injured worker was entitled to relief. Initially, the LHWCA provided coverage on the basis of a "situs test" alone, allowing recovery for a work-related injury as long as the injury occurred on "navigable waters" and the employer had at least one employee (but not necessarily the injured employee) who was engaged in maritime employment. *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 264 (1977) (citing *Pa. R.R. Co. v. O'Rourke*, 344 U.S. 334, 340-42 (1953)). Thus construed, however, the situs test often produced arbitrarily restrictive outcomes. *See, e.g., Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 224-25 (1969) (holding that longshoremen killed or injured on a pier while loading or unloading a ship were not covered under the Act, but would be if they had been thrown into the water or were on the deck of the ship when the accident happened).

To address this problem, Congress in 1972 broadened the situs test, which now provides:

> Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a). Effectively, Congress redefined "navigable waters" to include landward areas where maritime employees might be working, so they remained covered by the Act even if they were on the landward side of the pier when the injury occurred, and to avoid making coverage dependent on "where the body falls." *Nacirema,* 396 U.S. at 224 (1969) (Douglas, J., dissenting).

But this broader situs test, if applied alone, could extend the LHWCA's coverage to non-maritime workers who simply happened to be injured near the water's edge. Accordingly, the 1972 amendment included a new "status" test, which defines the word "employee" to mean "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3). The status test also continues the Act's exclusion of seamen, excepting from coverage "a master or member of a crew of any vessel," § 902(G), thus preserving the mutually-exclusive relationship between the Jones Act and the LHWCA.

With this historical context in mind, we now turn to a brief discussion of Tracy's work for Global before analyzing his claims.

## B

Tracy was hired by Global in March 1998 as a barge fore-man. Although Tracy was assigned to several vessels and locations during his employment by Global, on appeal he points to only two assignments where he qualified for cover-age under the Act: (1) his assignment to the *Iroquois*, and (2) his assignment in the ports of Indonesia and Singapore.

Tracy's assignment to the *Iroquois*, a pipe-laying derrick barge, commenced when he was first hired by Global in March 1998. For the first three weeks of Tracy's employment, the *Iroquois* was floating in a shipyard in Louisiana, and Tracy was assigned to do repairs, maintenance, and modifica-tions to the deck to ensure the *Iroquois*'s seaworthiness and prepare it for its mission. He also assisted with work on some other barges during his time in Louisiana, although he was assigned only to the *Iroquois*.

After preparations were complete, the *Iroquois* was towed from Louisiana to Tuxpan, Mexico. Tracy served as barge

foreman on the *Iroquois* and was third in command over a skeleton crew of about 60 people during the voyage, which took about seven days. When the barge arrived in Mexico, Tracy first worked in the port, helping to check and load equipment, doing repairs, and performing general maintenance on the *Iroquois* until the barge was ready to set out on its mission of laying pipe off the coast of Del Carmen, Mexico. Once the *Iroquois* commenced this mission, Tracy oversaw the barge's general maintenance. While the *Iroquois* was still laying pipe off Del Carmen, Global reassigned Tracy to the *Seminole*, a pipe-laying barge located in Malaysia. Tracy served as the *Seminole*'s anchor foreman for about four to six months.

The second assignment on which Tracy relies occurred after his work on the *Seminole*. Beginning some time in 1999, Tracy was periodically assigned to land-based assignments in the ports of Singapore and a shipyard in Indonesia. These assignments generally took place during the monsoon season (from October through March), and were designed to keep Tracy in Global's employ even when the barge to which he was assigned had been temporarily brought into port. This shore-side work in the ports of Indonesia and Singapore included organizing a recently-acquired yard and making major repairs and modifications to equipment. Tracy also performed various other port duties, such as helping to load and unload trucks, barges, and other vessels to which he was not assigned.

At some point, Tracy was reassigned to the *Seminole*, on which he was working when he suffered a heart attack in 2002 that ended his employment. In February 2003, Tracy filed a claim for benefits under the Act against Global for his hearing loss, upper extremity trauma, and heart condition. Global denied his claim, and Tracy requested a hearing before an administrative law judge (ALJ).

The ALJ granted two partial summary judgments in Global's favor before finally issuing a lengthy order that resolved the remaining eleven issues in the case. Relevant here, the ALJ found that Tracy's disability resulted from cumulative trauma experienced during both his employment by Keller and his employment by Global.[4] The ALJ held, however, that Tracy was not covered by the Act when he was working for Global because none of his assignments satisfied both the status and situs tests. The ALJ further rejected Tracy's argument that Global should be estopped from denying coverage under the Act based on the workers' compensation clause of his employment contract, finding that Tracy had not made the required factual showing to support application of estoppel. The BRB affirmed the ALJ's decision in all relevant respects.

## II

On appeal, Tracy disputes these conclusions, arguing that his assignments both to the Louisiana shipyard and to the ports of Indonesia and Singapore satisfied the status and situs tests.[5] We now evaluate these issues in turn.

We review a decision of the BRB "for errors of law and adherence to the substantial evidence standard, and may affirm on any basis contained in the record." *Brady-Hamilton Stevedore Co. v. Dir., Office of Workers' Comp. Programs*, 58 F.3d 419, 421 (9th Cir. 1995) (quoting *Cretan v. Bethlehem Steel Corp.*, 1 F.3d 843, 845 (9th Cir. 1993)) (internal quotation marks omitted). On questions of law, we review the BRB's decision de novo and do not give it any special defer-

---

[4]Tracy had previously worked for Keller from July 1996 to November 1997 on a sewer project for the city of San Diego.

[5]Tracy also argues that the ALJ and BRB erred in restricting the compensation for his injuries by reference to the maximum rate "applicable" during 1998. As Tracy acknowledges, this issue is squarely controlled by *Roberts v. Dir., Office of Workers' Compensation Programs*, 625 F.3d 1204 (9th Cir. 2010), which was affirmed by *Roberts v. Sea-Land Services, Inc.*, 132 S. Ct. 1350 (2012).

ence. *Stevedoring Servs. of Am. v. Price*, 382 F.3d 878, 883 (9th Cir. 2004); *see also Potomac Elec. Power Co. v. Dir., Office of Workers' Comp. Programs*, 449 U.S. 268, 278 n.18 (1980).

### A

We first consider Tracy's arguments relating to his assignment to the *Iroquois.* As discussed above, the BRB affirmed the ALJ's finding that the status requirement of the Act was not satisfied during the entirety of Tracy's assignment to the *Iroquois*, even when it was in dock in Louisiana. The ALJ had ruled that Tracy was a seaman (and thus did not satisfy the Act's status test) even while working in the Louisiana shipyards because he was hired for service on and to the *Iroquois* and all of his duties contributed to the function or mission of that vessel.

On appeal, Tracy does not dispute that he qualified as a seaman when the *Iroquois* set out for Mexico and while it was laying pipe off the Mexican shore because he was a member of the crew. Nor does he contest that the *Iroquois* was a vessel in navigation, even during the time it was in drydock. *See Chandris,* 515 U.S. at 373-74. Rather, he argues that the first three weeks he was employed by Global while the *Iroquois* was being readied, during which time he also assisted with loading other vessels that were also in the yard, should be viewed as a different work assignment in which he had different "essential duties." *Cf. id.* at 372. Tracy argues that he was not a seaman during those three weeks and so this period satisfied the status test.

### 1

In order to analyze Tracy's argument, we turn to the Supreme Court's two-prong test, as set forth in *Chandris*, for determining whether an injured claimant is a seaman who is

entitled to coverage under the Jones Act (and therefore excluded from LHWCA coverage). *See id.* at 356, 368.

**[1]** First, the employee's duties must "contribut[e] to the function of the vessel or to the accomplishment of its mission." *Id.* at 368 (quoting *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 355 (1991) (alteration in original). "[T]his threshold requirement is very broad: All who work at sea in the service of a ship are eligible for seaman status." *Id.* (emphasis omitted) (quoting *Wilander*, 498 U.S. at 354) (internal quotation marks omitted).

**[2]** Second, the purported seaman "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* The purpose of this requirement is to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Id.* The Court established "an appropriate rule of thumb for the ordinary case," namely that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* at 371. Moreover, the "total circumstances" of an individual's employment must be weighed, rather than a mere "snapshot" of the moment of injury, to ensure that a worker does not "oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." *Id.* at 363, 370.

*Chandris* thus underscored that the Jones Act inquiry is "fundamentally status-based." By extension, it reinforces an earlier holding that the Jones Act "does not cover probable or expectant seamen but seamen in being." *See Desper v. Starved Rock Ferry Co.*, 342 U.S. 187 (1952). In *Desper*, the Court considered whether a worker who was injured while doing repair work on sightseeing boats that had been beached and were on blocks was a seaman for purposes of the Jones

Act. *Id.* at 188-89. Even though Desper had an expectation of being hired to operate the boats in the future, the Court held that he was not a seaman at the time of his accident because the boats were not afloat, had neither captain nor crew, and were undergoing work of the sort typically done by shore-based workers. *Id.* at 190. We followed *Desper* in *Heise v. Fishing Co. of Alaska*, holding that the claimant, who had been hired to help repair and perform maintenance on a fishing vessel while it was laid up for the winter, was not a seaman for purposes of the Jones Act. *See* 79 F.3d 903, 904 (9th Cir. 1996).

2

**[3]** We now apply the *Chandris* framework to Tracy's argument that he did not qualify as a seaman while he was working in the Louisiana shipyard for the first three weeks of his *Iroquois* assignment. Tracy easily meets the first "essential requirement" of seaman status: that the employee's duties "contribut[e] to the function of the vessel or to the accomplishment of its mission." *Chandris*, 515 U.S. at 368. Global hired Tracy to be the barge foreman of the *Iroquois*, and substantial evidence supported the ALJ's finding that his various duties related to the *Iroquois*, including during the three-week period when he was engaged in various repairs, maintenance, and preparations while the *Iroquois* was in dry dock, were in furtherance of accomplishing its mission of laying pipe. Considering the total circumstances of Tracy's work in the Louisiana shipyard, the ALJ did not err in determining that his duties contributed to the function of the *Iroquois* and the accomplishment of its mission.

**[4]** We consider next whether Tracy satisfied the second prong of the *Chandris* test, which requires a substantial connection to a vessel in both "duration" and "nature." *Id.* Under the totality of the circumstances in this case, there is no basis for artificially separating Tracy's first three weeks of work on the *Iroquois* from the rest of his *Iroquois* assignment. We

therefore conclude that the ALJ did not err in declining to do so. Tracy was hired as barge foreman of the *Iroquois*, his work in the shipyard was in service to the *Iroquois*, and he set sail on the *Iroquois*. In no sense could Tracy be considered a "land-based worker[ ] who ha[s] only a transitory or sporadic connection to a vessel in navigation." *Id.*

Nor did Tracy come close to "spend[ing] less than about 30 percent of his time in the service of a vessel in navigation." *Id.* at 371. Rather, almost all of his time in the Louisiana shipyard, the Gulf of Mexico, the port of Tuxpan, and off the coast of Del Carmen, was in the service of the *Iroquois* as its barge foreman. Although Tracy performed some duties in connection with other vessels during the three weeks before the *Iroquois* set sail, he testified that he was not assigned to those other vessels, and there was no evidence that the work he did in connection with any other vessel was substantial in either nature or duration.

Tracy further argues that during this three-week period he was merely an expectant sailor, as in *Desper* and *Heise*. Again, we disagree. Tracy was an experienced seaman whose connection to the *Iroquois* as barge foreman was established from the beginning of his employment.

**[5]** Accordingly, we hold that Tracy was not just an "expectant" or "probable" seaman, but a "seaman in being" for the entire time that he was employed as barge foreman of the *Iroquois*, which was a vessel in navigation even during the time it was docked in the Louisiana shipyard. Because Tracy was a member of a crew of a vessel in navigation, and thus a seaman for purposes of the Jones Act, he was not an "employee" as defined by the LHWCA and did not satisfy the status test during his assignment to the *Iroquois*. *See* 33 U.S.C. § 902(3)(G).

B

We next consider Tracy's arguments relating to his assignment to the ports of Indonesia and Singapore. Tracy claims that his injury in these foreign ports constituted an injury "upon the navigable waters of the United States" within the meaning of the Act, and that the BRB therefore erred in holding that he did not meet the situs test of the Act. Tracy presents a three-step argument to support his claim: he asserts that (1) "navigable waters of the United States" include the "high seas;" (2) the high seas include "foreign territorial waters," and thus (3) § 903(a) makes the land areas adjoining foreign territorial waters part of the navigable waters of the United States.[6]

1

[6] Tracy's first premise, that the Act applies to the high seas, is supported by our case law. We have previously asserted that Congress intended the Act's coverage to extend to the high seas. *See Saipan Stevedore Co. v. Dir., Office of Workers' Comp. Programs*, 133 F.3d 717, 723 (9th Cir. 1998). In so stating, *Saipan* drew on the analysis set forth in a Second Circuit case, *Kollias v. D & G Marine Maintenance*, 29 F.3d 67 (2d Cir. 1994). *Kollias* based its conclusion that Congress intended the Act to apply to the high seas on three primary factors: Congress's goal of providing consistent cov-

---

[6]The Act does not include definitions of the "high seas" or "territorial waters." The Supreme Court has explained, however, that the waters "[n]earest to the nation's shores are its inland, or internal waters," and these inland waters "are subject to the complete sovereignty of the nation, as much as if they were a part of its land territory." *United States v. Louisiana*, 394 U.S. 11, 22 (1969). The "territorial sea" of a nation is a belt of waters "[b]eyond the inland waters, and measured from their seaward edge," where "the coastal nation may exercise extensive control but cannot deny the right of innocent passage to foreign nations." *Id.* Finally, "[o]utside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation." *Id.* at 23.

erage; a reference to the "high seas" in one section of the Act, 33 U.S.C. § 939(b);[7] and the Director's interpretation that the Act applied to the high seas. *Id.* at 73-75.

[7] The second step in Tracy's syllogism is that the "high seas" includes foreign territorial waters. This would be an extension of the law; we have not previously reached such a conclusion, nor are we aware of any other circuit doing so.[8] To support this point, Tracy relies only on our decision in *Howard v. Crystal Cruises, Inc.*, in which we interpreted the scope of the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 30301-08, as reaching to foreign territorial waters. *See* 41 F.3d 527, 530 (9th Cir. 1994). DOHSA provides that "[w]hen the death of an individual is caused by wrongful act . . . occurring on the high seas beyond 3 nautical miles from the shore of the United States," the representative of the decedent may file an action for damages. 46 U.S.C. § 30302. Concluding that there was nothing "inherently absurd with the notion of an American court applying American law to an action filed by an American plaintiff against an American defendant, particularly when the law in question was expressly designed to cover wrongful deaths occurring outside the territorial boundaries of the United States," we held that the wife of a cruise passenger who died as a result of an injury sustained when disembarking from the cruise vessel in Mexican territorial waters could bring her claims under DOHSA. *Howard*, 41 F.3d at 530. Therefore, Tracy concludes, we should likewise hold that an employee who is sta-

---

[7]Section 939(b) provides in part that "[j]udicial proceedings under [the Act] in respect of any injury or death occurring on the high seas shall be instituted in the district court within whose territorial jurisdiction is located the office of the deputy commissioner having jurisdiction in respect of such injury or death." 33 U.S.C. § 939(b).

[8]*But see Weber v. S.C. Loveland Co.*, 28 Ben. Rev. Bd. Serv. (MB) 321 (1994) (allowing coverage under the Act for a longshoreman, who testified that 90 to 95 percent of his work occurred within the United States, who was injured in a Jamaican port while unloading grain from a vessel that had been loaded in New Orleans.).

tioned in a foreign nation's inland area is a covered worker under the Act, so long as the inland area is adjacent to a foreign port and thus contiguous to foreign inland waters and foreign territorial seas.

2

Regardless of the merits of Tracy's logic, his argument does not overcome the strong presumption that enactments of Congress do not apply extraterritorially. *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010).

[8] In *Morrison*, the Supreme Court provided guidance on how federal courts should determine whether a statute has extraterritorial application: "unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions." *Id.* at 2877 (quoting *EEOC v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991)) (internal quotation marks omitted). *Morrison* thus rejected the widespread practice among circuit courts of trying "to 'discern' whether Congress would have wanted [a federal] statute to apply" extraterritorially, and it also rejected the courts' development of complex tests that were difficult to apply. *Id.* at 2878. "Rather than guess anew in each case," federal courts must "apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

With those principles in mind, *Morrison* reviewed the textual evidence of whether Congress intended the principal anti-fraud provision of the Securities Exchange Act of 1934 ("Exchange Act"), § 10(b), to apply extraterritorially. The Exchange Act referred generally to "foreign commerce," 15 U.S.C. § 78c(a)(17), mentioned dissemination of transaction prices in "foreign countries," 15 U.S.C. § 78b(2), and con-

ferred limited regulatory power over foreign activity to prevent evasion of the Exchange Act, 15 U.S.C. § 78dd(b). But these "uncertain indications" were not enough, the Court held, to overcome the presumption against extraterritoriality. 130 S. Ct. at 2883. Rather, based on the numerous references to domestic securities activity throughout the statute, it was clear that U.S.-based purchase-and-sale transactions are the "object of the statute's solicitude." *Id.* at 2884.

The Court further noted that § 30(a) of the Exchange Act did contain a clear statement of extraterritorial effect,[9] which "would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges." *Id.* at 2883. And in any event, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Id.* That is, courts must find clear and independent textual support — rather than relying on mere inference — to justify the nature and extent of each statutory application abroad.

**[9]** In applying *Morrison*'s presumption against extraterritoriality to § 903(a) of the LHWCA, we begin with the plain text of the statute, which limits coverage to injuries that occur "upon the navigable waters of the United States." 33 U.S.C. § 903(a). There is no indication at all, much less a clear indication, that Congress meant "navigable waters of the United States" to include territorial waters of foreign sovereigns. Moreover, there is no hint that Congress intended the landward reach of the term "navigable waters" to include the "adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area" of a foreign nation. As with

---

[9]Section 30(a) makes it unlawful "for any broker or dealer . . . to make use of the mails or of any means or instrumentality of interstate commerce for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States, any transaction in any security the issuer of which is . . . within or subject to the jurisdiction of the United States." 15 U.S.C. § 78dd(a).

the Exchange Act in *Morrison*, the "object of the statute's solicitude" here is fundamentally domestic: Congress passed the LHWCA to provide workers' compensation coverage for those employees who could not be covered by the Jones Act or state workers' compensation schemes.

Tracy nonetheless argues that § 939(b) of the Act, which refers to the "high seas," should establish that Congress intended the Act to apply extraterritorially. This section directs the Secretary of Labor to establish compensation districts that "include the high seas and the areas within the United States to which this chapter applies," while also addressing district court jurisdiction over "injury or death occurring on the high seas." 33 U.S.C. § 939(b). We need not decide here whether this single reference, under *Morrison,* is enough to indicate that Congress intended the Act to cover maritime workers injured on the high seas. *Cf.* 130 S. Ct. at 2882. Either way, the provision does not address, and therefore cannot overcome, the presumption that the Act does not apply to foreign territorial water or a foreign sovereign's lands. *See id.* at 2883 ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.").

For similar reasons, Tracy's reliance on *Saipan* is misplaced. A determination that the Act applies to the high seas, where no single nation is sovereign, cannot compel the conclusion that Congress also intended the Act to apply to the territorial sea, internal waters, and adjoining land of other nations, all areas in which those nations exercise sovereign control. *See Louisiana*, 394 U.S. at 22. Nor does *Howard* help Tracy, as *Howard* was interpreting a different act that is extraterritorial by its very nature, addressing injuries and deaths that occur in a context Congress would have rightly understood to involve excursions into foreign territorial waters. *See Howard*, 41 F.3d at 530 (noting that "the law in question was expressly designed to cover wrongful deaths occurring outside the territorial boundaries of the United States.").

**[10]** Finally, we consider the effect of the Director's support for Tracy's interpretation.[10] We deem reasonable interpretations of the Director to have "at least some" persuasive force if the statute is silent or ambiguous with respect to the specific issue and the Director's interpretation is based on a permissible construction of the statute. *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 136 (1997); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Price v. Stevedoring Servs. of Am.*, No. 08-71719, slip op. at 10461-62 (9th Cir. Sept. 4, 2012) (en banc) (holding that the Director's litigating position was not entitled to *Chevron* deference, but did warrant *Skidmore* respect on certain issues where the "arguments [were] persuasive" and the "agency's manual and practice [had] for some time consistently advanced a reasonable position."). According to the Director, "[i]n the absence of any express provision in the Act barring its reach to foreign waters, Longshore coverage should be interpreted . . . to extend to injuries on foreign territorial waters." But *Morrison* tells us that this is backward: courts must presume that there is no coverage in foreign territorial waters and in foreign ports in the absence of a "clear indication" to the contrary. Because the Director cites no textual evidence of Congress's clear intention to authorize the extraterritorial application of the Act, the Director's interpretation lacks persuasive force. *See* 130 S. Ct. at 2887-88.

**[11]** Accordingly, we hold that foreign territorial waters and their adjoining ports and shore-based areas are not the "navigable waters of the United States" as the Act defines that phrase. *See* 33 U.S.C. § 903(a). Tracy's injuries as a worker in the ports of Indonesia and Singapore thus do not satisfy the situs test for coverage. By extension, the BRB did not err in concluding that injuries to a "long-term, contractual, Global employee who was based overseas" and whose assignments "commenced and terminated in foreign territories on foreign

---

[10]Although the Director of the Office of Workers' Compensation Programs is named as the federal respondent, he supports Tracy's appeal.

waters" did not occur upon the "navigable waters of the United States."

## III

Finally, Tracy argues that even if he does not meet the LHWCA's coverage criteria, Global should be estopped from denying coverage because his employment contract provided, in part, that "[e]mployee is covered for worker's compensation benefits, if any, payable under the laws of the Employee's country of origin." Tracy contends that this provision constitutes Global's assurance that he would be entitled to recovery of compensation under the Act. He argues that Global is bound by this promise and should be estopped from raising any defenses to the applicability of the Act. The ALJ and BRB rejected this argument, holding that Tracy had not made the required showing for equitable estoppel. We agree and decline to use our equitable powers to contravene the statute.

Equitable estoppel prevents a party from asserting a strict legal right after another party has been led to form a reasonable belief that the right would not be asserted. In this sense, equitable estoppel functions as a "shield," *see Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981). Indeed, one of many equitable principles observed is that estoppel does not create new rights, affirmative duties, or liabilities where none previously existed. *See United States v. Ga.-Pac. Co.*, 421 F.2d 92, 96 (9th Cir. 1970). For these reasons, as well as the fact that estoppel effectively bars a party from asserting a legal right, its application is strictly limited by equitable considerations and courts must apply it with caution and restraint. *See, e.g.*, *Redman v. U.S. W. Bus. Res., Inc.*, 153 F.3d 691, 696 (8th Cir. 1998) (noting that equitable estoppel "is an exception to the rule, and should . . . be used only in exceptional circumstances" (alteration in original) (internal quotation omitted)).

In *Heckler v. Community Health Services of Crawford County*, 467 U.S. 51 (1984), the Supreme Court set forth the contours of equitable estoppel as a matter of federal law. While remarking on the doctrine's "flexible application," the Court maintained that "certain principles are tolerably clear:"

> If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act . . . the first person is not entitled
>
> (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

*Id.* at 59 (quoting Restatement (Second) of Torts § 894(1) (1979)). Since *Heckler,* the Court has consistently affirmed the importance of detrimental reliance in estoppel determinations. *See CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011); *Lyng v. Payne*, 476 U.S. 926, 935 (1986).

We have previously considered application of equitable estoppel in the LHWCA context. *See Rambo v. Dir., Office of Workers' Comp. Programs*, 81 F.3d 840 (9th Cir. 1996), *reversed in part on other grounds sub nom. Metro. Stevedore Corp. v. Rambo*, 521 U.S. 121 (1997). In *Rambo*, which involved attempted modification of a benefits award under the Act, we set out four elements that must be shown for equitable estoppel to apply:

> "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter

must be ignorant of the facts; and (4) he must rely on the former's conduct to his injury."

*Id.* at 843. We have also considered equitable estoppel in the context of a time-barred Jones Act claim. *See Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116 (9th Cir. 2006). In both of these cases, the asserted claim of equitable estoppel failed because there was no showing of detrimental reliance. *See Rambo*, 81 F.3d at 843; *Huseman*, 471 F.3d at 1124.

**[12]** Bearing these principles of equitable estoppel in mind, we hold that the ALJ and BRB correctly found that Tracy has not shown that he is entitled to equitable estoppel. In the first place, the contract provides only that an "[e]mployee is covered for workers' compensation benefits, *if any*, payable under the laws of the Employee's country of origin," and thus it does not promise coverage under the Act. This provision could be referring to remedies under state workers' compensation laws, the LHWCA, or the Jones Act; indeed, the phrase "if any" implies that in some cases, no workers' compensation benefits are available under the relevant law. We see no evidence that Global represented to Tracy, who was hired as a barge foreman, that he would be covered by the LHWCA.

**[13]** What is more, Tracy failed to allege that he reasonably relied on this provision. Nor is there any such evidence in the record. Nothing suggests that Tracy was even aware of the contractual provision, let alone that he changed his position for the worse in reliance on it. For instance, there is no evidence that Global told Tracy to file a claim specifically under the Act instead of some other type of claim, and Tracy himself points out that he also filed for workers' compensation with the state of California.[11] And unlike *Huseman*, in which an expired statute of limitation precluded recovery, *see*

---

[11]We deny Tracy's motion to take judicial notice of the contents of the documents from Tracy's state workers' compensation case because they have no relevance to our decision here.

471 F.3d at 1117, there is no evidence before us that Tracy's belief that Global is the responsible employer instead of Keller has caused him any detriment at all, much less detriment for which Global should be held responsible.

[14] Tracy argues that he need not show detrimental reliance because "the doctrine on which he relied was 'a different kind of estoppel,' not equitable estoppel but 'more closely related to (*though still distinct from*) *promissory* estoppel." He contends that this species of estoppel is a common feature of workers' compensation law: "an employer who has given assurances that a worker is covered by a compensation law is estopped to deny such coverage once an injury occurs." We reject this argument. First, the state workers' compensation cases Tracy cites do not support his claim: in every case, the state court identified evidence of reliance by the claimant on the employer's representation that the claimant was covered by workers' compensation.[12] Second, we have no authority to depart from our precedent requiring evidence of detrimental reliance as a prerequisite to the application of equitable estoppel. Tracy has cited no case in which a federal court has done so. Because estoppel is such a powerful tool, the requirements of statutes and the ability to assert legal rights should not be easily set aside. We decline to extend this doctrine, which both we and the Supreme Court have interpreted and applied very narrowly, where not one of the essential elements has been shown and when doing so would defeat the express eligibility requirements of a federal statute. We therefore affirm

---

[12]*See, e.g.*, *Hall v. Spurlock*, 310 S.W. 2d 259, 261 (Ky. 1957) ("[W]here . . . a workman has been assured by the other party that he was covered by the provisions of the Workmen's Compensation Law, estoppel should be decreed."); *Tri-Union Express v. Workers' Comp. Appeal Bd. (Hickle)*, 703 A.2d 558, 560 (Pa. Commw. Ct. 1997) ("[T]he Claimant was advised . . . that the Claimant would be covered by Workers' Compensation Insurance," and "[t]he Claimant credibl[y] testified that the representation that the Claimant would be covered by Workers' Compensation was a big factor in his decision to sign on with [employer].").

the BRB's determination that equitable estoppel does not apply.

IV

In the LHWCA, Congress set out to provide workers' compensation for a category of employees who were not covered by already existing workers' compensation programs, and thus the Act's coverage is restricted by the status and situs tests. Tracy's employment by Global from 1998 to 2002 did not satisfy those tests, so the BRB did not err by holding that Global was not a responsible employer under the Act.

**AFFIRMED.**